# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## CASE NO. 22-10963-GG

_____

## UNITED STATES OF AMERICA,
### EX REL. BRUCE JACOBS,
### PLAINTIFF/APPELLANT,
### v.

## JPMORGAN CHASE BANK N.A.,
### DEFENDANT/APPELLEE.

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

## APPELLANT'S INITIAL BRIEF

_____

BENEDICT P. KUEHNE
MICHAEL T. DAVIS
KUEHNE DAVIS LAW, P.A.
100 SE 2D STREET, SUITE 3105
MIAMI, FL 33131-2154
MDAVIS@KUEHNELAW.COM
BEN.KUEHNE@KUEHNELAW.COM

THE LS LAW FIRM
LSANCHEZ@THELSFIRM.COM

COURT KEELEY, P.A.
CK@COURTKEELEY.COM

ROY D. WASSON
WASSON & ASSOCIATES, CHARTERED
COURTHOUSE PLAZA—SUITE 600
28 WEST FLAGLER STREET
MIAMI, FL 33130
ROY@WASSONANDASSOCIATES.COM
E-SERVICE@WASSONANDASSOCIATES.COM

BRUCE JACOBS
JACOBS LEGAL PLLC
EFILE@JAKELEGAL.COM

## CERTIFICATE OF INTERESTED PERSONS/CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellant certifies the following persons and entities may have an interest in this case:

Boese, Andrew B.

Cannon, Aileen M., U.S. District Judge

Cosgrove, Scott B.

Court Keeley, P.A.

Davis, Michael T.

Dmitrovsky, Susan

Dos Santos, Johan

Enenstein Pham & Glass, LLP

Jacobs, Bruce

JPMorgan Chase & Co. (NYSE: JPM)

JP Morgan Chase Bank, N.A.

Keeley, Court E.

Kuehne, Benedict P.

Kuehne Davis Law, P.A.

Leon Cosgrove LLC

Martens, Matthew T.

Morales, Anna C.

Otazo-Reyes, Alicia M., U.S. Magistrate Judge

Pham, Teri T.

Sanchez, Lily Ann

Schoenfeld, Alan E.

The LS Law Firm

Torres, Edwin G., U.S. Magistrate Judge

Vanguard Group, Inc.

Wasson and Associates, Chartered

Wasson, Roy D.

Weinberg, Benjamin

Weinkle, James A.

Williams, Kathleen M., U.S. District Judge

Wilmer Hale

## STATEMENT REGARDING ORAL ARGUMENT

Appellant suggests that the nature of the issues in this case, together the facts and procedural history hereof, render this one in which oral argument would be useful to the Court. Appellant respectfully requests the opportunity to present oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS/CORPORATE DISCLOSURE STATEMENT ................................................................. C1

STATEMENT REGARDING ORAL ARGUMENT ....................................... i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE AND FACTS ............................................... 2

    I.    JPMC Received Servicing Fees from Fannie and Freddie. .......................................................................... 3

        A.    Obligations under the Servicing Agreement and Guidelines. ............................................................... 5

            1.    Requirements to sell mortgage loans to GSEs. ............................................................. 6

            2.    Fannie and Freddie require their servicers to strictly comply with their guidelines when foreclosing their mortgage loans. ............ 8

        B.    Fannie and Freddie Servicers Are Required to File Annual Certifications of Compliance with Guidelines and Eligibility Requirements. .................. 9

    II.    Bruce Jacobs Is An Original Source Of Evidence Of False Claims. ........................................................................ 12

        A.    Relator Is The Original Source Of Information And Evidence That JPMC Never Endorsed Any Notes Within Days Of Origination. ........................... 16

1.  Relator's discoveries during his successful litigation in the John Riley Case: Relator discovers that WaMu notes were not endorsed within days of origination. ...............16

2.  Relator's discoveries during deposition of Barbara Hindman of no evidence that JPMC endorsed notes in the Jacksonville, Secondary Delivery Department. ....................17

B.  The Relator Is The Original Source Of Information That Testimony Given In State Court Foreclosure Proceedings Concerning The Endorsement Of Notes Was Coached And Fraudulent. ...............................................19

1.  False testimony: that JPMC facilitated trainings in 2016 and 2018 on the Cynthia Riley endorsement attended by its corporate representatives. ...............................20

2.  False testimony: Barbara Hindman personally saw notes endorsed within days of origination and communicated that to JPMC's testifying corporate representatives...................................................22

III.  Personal Blogs Alleging that JPMC Used One Employee's Stamp to Endorse Mortgage Notes After Her Termination from JPMC. .............................................24

STANDARD OF REVIEW ......................................................26

SUMMARY OF THE ARGUMENT ........................................27

ARGUMENT .........................................................................29

I.  THE FIRST AMENDED COMPLAINT PLEADS AN FCA CLAIM WITH SUFFICIENT PARTICULARITY....................31

II.  THE DISTRICT COURT ERRED IN FINDING A

PUBLIC DISCLOSURE OF FRAUD SUBSTANTIALLY SIMILAR TO THE ALLEGATIONS OF FRAUD ALLEGED IN THE FAC ........................................................ 41

    A.    The District Court Erred In Interpreting The False Claims Act's Public Disclosure Provision To Apply To Internet Blog Posts As Within The Meaning Of "News Media." ......................................... 42

    B.    The Allegations Of Fraud Contained In The Blogs Are Not Substantially Similar To The Allegations Of Fraud Presented In This Case .......... 52

III.    THE DISTRICT COURT ERRED IN FINDING THAT THE RELATOR IS NOT AN ORIGINAL SOURCE OF INFORMATION. .................................................. 58

CONCLUSION ........................................................ 61

CERTIFICATE OF COMPLIANCE ......................................... 61

CERTIFICATE OF SERVICE .............................................. 62

iv

# TABLE OF AUTHORITIES

**Page(s)**

*United States ex rel. Clausen v. Lab. Corp. of Am.,*
290 F.3d 1301 (11th Cir. 2002) .......................................... 31, 32

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ............................................................ 45

*Hill v. Morehouse Med. Assocs.,*
No. 02-14429, 2003 U.S. App. LEXIS 27956 (11th Cir. Aug. 15,
2003) ................................................................................... 31

*Hopper v. Solvay Pharm., Inc.,*
588 F.3d 1318 (11th Cir. 2009) .............................................. 32

*Jacobs v. Bank of America,*
U.S. District Case No. 1:15-cv-24585-UU, 2017 WL 1261943
(S.D. Fla., March 21, 2017) .................................................... 40

*Kiefert v. Nationstar Mortgage, L.L.C.,*
153 So. 3d 351 (Fla. 1st DCA 2014) ....................................... 13

*Kyser v. Bank of Am., N.A.,*
186 So. 3d 58 (Fla. 1st DCA 2016) ......................................... 13

*McClendon v. State,*
290 So. 2d 77 (Fla. 2d DCA 1974) .......................................... 36

*McLean v. JP Morgan Chase Bank N.A.,*
79 So. 3d 170 (Fla. 4th DCA 2012) ........................................ 13

*Medicare. Cooper v. Blue Cross & Blue Shield,*
19 F.3d 562 (11th Cir. 1994) ..................................... 55, 56, 59

*Murray v. HSBC Bank USA,*
157 So. 3d 355 (Fla. 4th DCA 2015) ...................................... 13

*Niz-Chavez v. Garland,*
141 S. Ct. 1474 (2021) ............................................................ 46

*Perrin v. United States,*
444 U.S. 37 (1979) ............................................................ 46-47

*Sosa v. U.S. Bank Nat'l Ass'n,*
    153 So. 3d 950 (Fla. 4th DCA 2014) ...................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ......................................................... 31-32

*U.S. Bank Trust, NA v. Steve Piecznick,*
    Miami-Dade Circuit Case No. 2016-14544-CA-01 .................. 22

*United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.,*
    816 F.3d 428 (6th Cir. 2016) ............................................... 58

*United States ex rel. Atkins v. McInteer,*
    470 F.3d 1350 (11th Cir. 2006) ............................................ 34

*United States ex rel. Colquitt v. Abbott Labs.,*
    864 F. Supp. 2d 499 (N.D. Tex. 2012) ................................... 51

*United States ex rel. Fla. Soc'y of Anesthesiologists v. Choudhry,*
    262 F. Supp. 3d 1299 (M.D. Fla. 2017) .................................. 35

*United States ex rel. Grubbs v. Ravikumar Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ........................................... 32, 33

*United States ex rel. Heater v. Holy Cross Hosp., Inc.,*
    510 F.Supp.2d 1027 (S.D. Fla. 2007) ..................................... 31

*United States ex rel. McFarland v. Fla. Pharmacy Sols.,*
    358 F. Supp. 3d 1316 (M.D. Fla. 2017) .................................. 58

*United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,*
    423 F.3d 1256 (11th Cir. 2005) ........................................ 29-30

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,*
    69 F. Supp. 3d 416 (D. Del. 2014) ......................................... 51

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,*
    812 F.3d 294 (3d Cir. 2016) ................................................. 59

*United States ex rel. Patel v. GE Healthcare, Inc.,*
    No. 8:14-cv-120-T-33TGW, 2017 U.S. Dist. LEXIS 159562 (M.D.

Fla. Sept. 28, 2017) .......................................................... 56, 57

*United States ex rel. Reed v. Keypoint Gov't Sols.*,
   923 F.3d 729 (10th Cir. 2019) ......................................... 52, 61

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
   659 F.3d 295 (3d Cir. 2011) .................................................. 29

*United States v. Health Mgmt. Assocs.*,
   591 F. App'x 693 (11th Cir. 2014) .............................. 34, 35, 37

*United States v. Humana, Inc.*,
   776 F.3d 805 (11th Cir. 2015) ......................................... 56, 59

*United States v. Mortg. Invs. Corp.*,
   987 F.3d 1340 (11th Cir. 2021) ............................................. 53

*United States v. Pemco Aeroplex, Inc.*,
   195 F.3d 1234 (11th Cir. 1999) ............................................. 30

*United States v. R&F Properties of Lake Cnty., Inc.*,
   433 F.3d 1349 (11th Cir. 2005) ............................................. 35

*United States, ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943) ............................................................... 47

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ........................................................... 30

*Urquilla-Diaz v. Kaplan Univ.*,
   780 F.3d 1039 (11th Cir. 2015) ............................................. 26

*Williams v. WMX Techs., Inc.*,
   112 F.3d 175 (5th Cir. 1997) ................................................. 33

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ..................................................... 45, 46

*Yates v. Pinellas Hematology & Oncology, P.A.*,
   21 F.4th 1288 (11th Cir. 2021) ............................................. 33

*Ziemba v. Cascade Intern., Inc.*,
   256 F.3d 1194 (11th Cir. 2001) ............................................. 33

## **Statutes**

28 U.S.C. § 1291 ............................................................ 1

28 U.S.C. § 1331 ............................................................ 1

31 U.S.C. § 3729 ................................................... 29, 30

31 U.S.C. § 3730 ............................... 41, 43, 50, 52, 58

186). § 831.01, Fla. Stat. ......................................... 36

Section 3730 ............................................................. 58

## **Rules**

Eleventh Circuit Rules

      Rule 26.1-1 ......................................................... 1

Federal Rules of Appellate Procedure

      Rule 32 ............................................................. 61

Federal Rules of Civil Procedure

      Rule 8 .............................................................. 31

      Rule 9 ...................................................... *passim*

## **Other**

Black's Law Dictionary 1124 (10th ed. 2014) ......................... 58-59

*Comment, Francis E. Purcell, Jr., Qui Tam Suits Under the False Claims Amendments Act of 1986: The Need for Clear Legislative Expression*, 42 Cath. U.L. Rev. 935 (Summer 1993) ................... 47

## STATEMENT OF JURISDICTION

The district court had jurisdiction. 28 U.S.C. § 1331. This Court has appellate jurisdiction. 28 U.S.C. § 1291. District Judge Cannon entered the Final Judgment on February 25, 2022 (DE68). Plaintiff filed a timely notice of appeal (DE69).

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in dismissing the False Claims Act complaint even though the complaint pled fraud with particularity?

II.    Whether the district court erred in dismissing the False Claims Act complaint after finding a public disclosure of fraud substantially similar to the allegations of fraud alleged in the complaint when the references to the factual underpinnings of the claim in online blogs do not satisfy the "news media" method of public disclosure because blogs did not exist when Congress enacted the "news media" exception?

III. Whether the district court erred in dismissing the complaint when the Relator is an Original Source of Information who materially added to what was included in those online blogs?

## STATEMENT OF THE CASE AND FACTS

Bruce Jacobs ("Relator") is an experienced foreclosure lawyer and original source of evidence that Defendant JPMorgan Chase Bank, N.A. ("JPMC") submitted false claims to the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie") (collectively "Fannie and Freddie") when JPMC made claims for servicing fees and foreclosure costs reimbursements (DE57, ¶¶ 69, 102). Specifically, the First Amended Complaint ("FAC") alleges JPMC violated the terms of its servicing agreement with Fannie Mae and Freddie Mac by misusing rubber signature stamps of former Washington Mutual Bank ("WaMu") to establish standing to foreclose on promissory notes originated by WaMu (DE57, ¶¶ 65, 102). JPMC failed to disclose its breach of the serving agreement and violation of the Fannie and Freddie servicing guidelines, falsely certified compliance with mandatory Fannie and Freddie guidelines, and failed to return money received from Fannie and Freddie. None of this was mentioned in the online blogs.

## I.    JPMC Received Servicing Fees from Fannie and Freddie.

Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs") receiving federal funds (DE57, ¶¶ 7-8). Fannie and Freddie purchase mortgages in the secondary market and securitize them (DE57, ¶ 9). Fannie and Freddie guarantee the timely payment of principal and interest on their mortgage-backed securities ("MBS"), the effect of which relieves lenders of default risk and free up lenders' capital to make additional loans (DE57, ¶ 9). Should the loan go into default, Fannie and Freddie absorb the risk of default by covering the costs of maintaining the property in foreclosure (i.e., HOA fees, property taxes, etc.) and the costs of litigating the foreclosure (i.e., filing fees, attorneys' fees) (DE57, ¶ 52).

Washington Mutual FA ("WaMu"), the former owner of WaMu Bank, was a mortgage lender until its collapse in 2008 (DE57, ¶ 46). Under its Mortgage Selling and Servicing Contract with Fannie and Freddie, WaMu sold loans to Fannie and Freddie (DE57, ¶ 47). In turn, Fannie and Freddie backed the loans, while WaMu serviced them (DE57, ¶ 47). The servicing contracts required WaMu to service the loan according to the provisions in the Fannie and Freddie

guidelines. Upon its collapse, JPMC purchased WaMu, becoming the successor in interest and the new servicer of the GSE-backed mortgage loans (DE57, ¶ 48). As the successor mortgage servicer, JPMC administered the WaMu/GSE-backed loans, including collecting and recording payments from borrowers (DE57, ¶ 49). It also handled loan defaults and foreclosures (DE57, ¶ 49).

As the servicer, JPMC received compensation and servicing fees for services rendered (DE57, ¶ 50). JPMC was reimbursed, pursuant to its servicing agreement, for payments it made for property taxes, insurance premiums, out of pocket expenses, and applicable HOA dues on defaulted property (DE57, ¶ 52). It also received reimbursement of fees for paying property taxes, special assessments, and other payments made to avoid possible tax liens as well as reimbursement for maintaining adequate property (hazard) insurance to cover damage from unforeseen casualty losses (DE57, ¶ 52). Per GSE guidelines, JPMC was entitled to receive reimbursements every six months with a final request for expense reimbursement due within 30 days after the defaulted property was disposed (DE57, ¶ 53). JPMC received a total of $14,368,724.58 in

compensation and servicing fees for just the WaMu loans originated in 2006 (DE57, ¶ 56).

Exhibits 2 and 3 to the FAC present details showing certain claims submitted by JPMC to Fannie and Freddie in connection with servicing default loans and securing foreclosure judgments (DE57-2; DE57-3). For example, Exhibit 3 shows that from June 1, 2012, to July 1, 2014, JPMC submitted claims to and received payments from the United States, through Freddie, in connection with Loan F106Q1235608 (the Aguiar mortgage note), for expenses and servicing fees totaling at least $53,850.00, divided as follows (DE57-3:2):

- Servicing Fees Payments: $2,859.29
- Foreclosure Costs Payments: $5,488
- Property Preservation Costs Payments: $31,718
- Miscellaneous Expenses Payments: $1,312
- Tax Payments: $15,332

Exhibits 2 and 3 provide sample data for fourteen (14) other individual loans, totaling $538,793.23 in claims from and payments to JPMC Relator identified as false claims to Fannie and Freddie.

### A. Obligations under the Servicing Agreement and Guidelines.

Entitlement to receive servicing fees and foreclosure costs from

Fannie and Freddie is contingent upon JPMC's compliance with all Fannie and Freddie guidelines and servicing contracts (DE57, ¶¶ 12, 32). Those obligations start from the point of sale and last through the life of the loan (DE57, ¶ 16). A violation of any representation or warranty found in the Servicing Guide and in the Lender Contract is a breach of the Lender Contract that triggers several remedies for Fannie and Freddie, including the requirement that the seller purchase back the mortgage or make whole payments to the GSE (DE57, ¶¶ 21, 37).

How JPMC originates, services, and forecloses consumer mortgage loans matters to the government. Because of prior foreclosure practices, JPMC entered a consent judgment with the Department of Treasury's Office of the Comptroller of the Currency as well as the 2012 $25 Billion National Mortgage Settlement ("NMS") (DE57, ¶ 5). Pursuant to these, JPMC promised to stop using false evidence in foreclosures, including the use of forged endorsements (DE57, ¶ 93).

### 1. *Requirements to sell mortgage loans to GSEs.*

To sell mortgage loans to GSEs or deliver pools of mortgage

loans to it for MBS, the originating lender must be the original payee on the note (DE57, ¶ 17). The mortgage note must be endorsed to each subsequent owner of the mortgage unless one or more of the owners endorsed the note in blank. The last endorsement on the note should be that of the mortgage seller. The mortgage seller must endorse the note in blank and without recourse. The document custodian must certify the loans meet these requirements.

When loans are sold to Fannie and Freddie, the lender certifies that all loans under the certification meet Fannie and Freddie's requirements (DE57, ¶ 18). A lender must notify Fannie immediately if, after conducting due diligence, it determines that a reasonable basis exists to conclude that a breach of a selling warranty may have occurred (DE57, ¶ 23). Such disclosures must also be reported in the annual certification.

Mortgage notes sold to Fannie and Freddie by WaMu were not properly endorsed in blank and without recourse (DE57, ¶¶ 65, 102). When JPMC learned of this, it failed to inform Fannie and Freddie (DE57, ¶ 72). JPMC instead knowingly used the rubber stamps of former WaMu employees to endorse the notes to secure foreclosure

judgments in state courts (DE57, ¶¶ 72-76, 102).

> **2.** ***Fannie and Freddie require their servicers to strictly comply with their guidelines when foreclosing their mortgage loans.***

Should a loan go into default, there are guidelines for foreclosing on the mortgage loan. At the time of referring a case to a lawyer for initiation of a foreclosure proceeding, the servicer must "provide the law firm with a true, correct, and complete copy of the note, including any allonge, produced from the original held by the document custodian; the original note, including any allonge; or a lost note affidavit." (DE57, ¶ 34). The note provided to the lawyer for foreclosure must have all endorsements.

Failure to provide proper documentation in support of a foreclosure proceeding carries significant penalties, including repurchase of the loan from Fannie and compensatory fees (DE57, ¶ 35). The GSE can deny reimbursement of fees and out-of-pocket expenses for any referrals to law firms that fail to follow the requirements for referring a case to the lawyer (DE57, ¶ 36). Similarly, the GSE may "[a]ssess compensatory fees and/or seek repayment of losses sustained due to errors, omissions or delays by

the Servicer or its agent." (DE57, ¶ 36).

JPMC breached these requirements by endorsing WaMu-originated notes through the misuse of rubber stamps of former WaMu employees (DE57, ¶¶ 68, 102, 180). The endorsements submitted to JPMC's foreclosure lawyers were not true signatures (DE57, ¶ 65). They were forgeries (DE57, ¶ 102). JPMC compounded the fraud by falsely swearing in multiple lawsuits that the notes were imaged and endorsed within days of origination (DE57, ¶ 132).

### B. Fannie and Freddie Servicers Are Required to File Annual Certifications of Compliance with Guidelines and Eligibility Requirements.

JPMC, as a servicer, is required to file annual certifications by March 31 of each year (DE57, ¶¶ 38, 40). The required forms enable the GSEs to verify that JPMC continues to meet basic eligibility requirements and is in compliance with GSE requirements for servicing (DE57, ¶ 39). Specifically, Form 16SF requires a certification that the servicer continues to meet the eligibility requirements and is in compliance with the provisions and requirements of the Servicing Guidelines as well as the servicer's other Purchase Documents (DE57, ¶ 41). If the servicer does not meet

or comply with one or more requirements, it must identify each such failure on Form 16SF together with such information concerning remediation of such failure as Freddie may request (DE57, ¶ 41).

In the annual certification, the servicer is required to affirm that "all representations and warranties made by [the servicer] in the Lender Contract regarding [the servicers'] Mortgages continue to be accurate and true in all respects." (DE57, ¶ 42). The servicer additionally affirms that it complies with all lender eligibility requirements, the mortgage selling & servicing contract, all applicable guidelines, all applicable laws, and all other parts of the lender contract (DE57, ¶ 43). Failure to comply with the annual certification is grounds for suspension or disqualification of the seller/servicer (DE57, ¶ 44).

JPMC's annual certifications, filed on or before March 31 of each year, contained several materially false certifications (DE57, ¶ 67). Specifically, JPMC falsely certified that "all representations and warranties made by [the servicer] in the Lender Contract regarding [the servicers'] Mortgages continue to be accurate and true in all respects." (DE57, ¶ 67). JPMC also falsely certified compliance with

10

lender eligibility requirements, the mortgage selling & servicing contract, the servicing guidelines, as well as all applicable laws (DE57, ¶ 67). The annual certifications were false and fraudulent because JPMC was not in compliance with Fannie and Freddie guidelines and because JPMC was in breach of its servicing agreement (DE57, ¶ 68).

JPMC's false affirmations and omissions were material because disclosure of its noncompliance with GSE guidelines and breach of applicable representations and warranties were grounds for triggering the purchase back provisions of the GSE guide, requiring payment of the make whole payments, and/or cancellation of JPMC's lucrative servicing agreement (DE57, ¶ 70).

Rather than disclose the breaches, JPMC initiated a cover up scheme aimed to conceal the absence of a properly endorsed note when the mortgage note was sold to Fannie and Freddie (DE57, ¶ 72). JPMC then knowingly submitted false records to state courts across the nation in foreclosure proceedings (DE57, ¶ 72). JPMC knew the promissory notes did not convey marketable title and that its foreclosure proceedings would not, could not, and did not secure

marketable title (DE57, ¶ 76). Despite knowing this, JPMC failed to repurchase the loans or tender the make whole payments to Fannie and Freddie (DE57, ¶ 77).

## II. Bruce Jacobs Is An Original Source Of Evidence Of False Claims.

Mr. Jacobs knows about JPMC's conduct because of his extensive and innovative South Florida foreclosure practice (DE57, ¶ 86). Since 2008, Jacobs has defended foreclosures initiated by JPMC on WaMu-originated loans sold to Fannie and Freddie (DE57, ¶ 104). Through his practice, Mr. Jacobs learned JPMC was servicing loans for Fannie and Freddie and foreclosing while warranting to Fannie and Freddie that it sold, transferred, set over, and otherwise conveyed all right, title, and interest in the WaMu mortgage loans (DE57, ¶ 174). It did so by claiming in mortgage foreclosure actions that JPMC was the holder of lawful and marketable title of WaMu notes that were imaged and endorsed within days of origination, when it was not (DE57, ¶57, ¶ 99).

Under Florida law, "'A crucial element in any mortgage foreclosure proceeding is that the party seeking foreclosure must demonstrate that it has standing to foreclose' when the complaint is

filed." *Murray v. HSBC Bank USA*, 157 So. 3d 355, 357 (Fla. 4th DCA 2015) (quoting *McLean v. JP Morgan Chase Bank N.A.*, 79 So. 3d 170, 173 (Fla. 4th DCA 2012)). "[A] plaintiff must prove not only physical possession of the original note but also, if the plaintiff is not the named payee, possession of the original note endorsed in favor of the plaintiff or in blank .... if the foreclosure plaintiff is not the original, named payee, the plaintiff must establish that the note was endorsed (either in favor of the original plaintiff or in blank) before the filing of the complaint in order to prove standing as a holder." *Kyser v. Bank of Am., N.A.*, 186 So. 3d 58, 60 (Fla. 1st DCA 2016) (quoting *Kiefert v. Nationstar Mortgage, L.L.C.*, 153 So. 3d 351, 352 (Fla. 1st DCA 2014)).

*Kiefert* 153 So. 3d at 353, held that the appellee failed to establish that the original plaintiff, Aurora Loan Services, LLC, had standing to foreclose and noted that while the appellant's counsel pressed the appellee's witness concerning his knowledge, if any, of when the note had been endorsed, the witness's testimony established only that Aurora was in possession of the note at the time the complaint was filed, not that the note had been endorsed at the

time the complaint was filed. " *See also Sosa v. U.S. Bank Nat'l Ass'n,* 153 So. 3d 950, 951-52 (Fla. 4th DCA 2014) (holding that the appellee failed to establish standing to foreclose where the original note and the allonge to the note were filed after the foreclosure complaint and each contained undated special endorsements and where the appellee's analyst never stated when the appellee became the owner of the note and explaining that "[a]lthough the analyst testified that [the appellee's servicer] came into possession of the note prior to filing the foreclosure action, such testimony is not dispositive as it is still unclear when [the appellee], through the placement of the special endorsement, became the owner of the note").

In his practice, Mr. Jacobs has been at the forefront of litigating the question of JPMC's standing to bring foreclosure action (DE57, ¶¶ 86-87, 102). As to standing, a key factual question is: Who affixed the WaMu endorsements to notes later purchased by JPMC? Was it WaMu or JPMC?

In foreclosure proceedings, JPMC presented corporate representatives swearing that WaMu's daily practice was that all notes were imaged within several days of origination and endorsed in

the Secondary Delivery Department (DE57, ¶ 132). In litigation, JPMC does not produce and has not produced the Secondary Delivery Department employees who purportedly endorsed the notes within days of origination (DE57, ¶ 133). Nor has JPMC produced a scanned copy of the note created within days of origination. To the contrary, JPMC produced images of promissory notes created years after origination that are not endorsed (DE57, ¶ 131).

Through Mr. Jacobs' foreclosure litigation, Mr. Jacobs acquired unique, first-hand evidence that JPMC's WaMu notes had not been endorsed within days of origination as JPMC claims (DE57, ¶ 102). Rather, JPMC utilized rubber signature stamps of former WaMu employees to establish standing belatedly and fraudulently (DE57, ¶¶ 68, 102, 180). The use of former WaMu employees' signatures was forgery because WaMu had ceased operations and its employees could not give permission for JPMC to use his/her signature (DE57, ¶¶ 102, 193).

After forging endorsements on the notes, JPMC foreclosed the mortgages by relying on the very same forged endorsements, knowing that it did not have marketable title because of the forgery (DE57, ¶

15

102). Worse, during foreclosure proceedings related to the date of note endorsement, JPMC coached corporate representative to claim that WaMu's corporate policy was to endorse mortgage notes within days of origination and misled courts with its coached witnesses (DE57, ¶ 102).

      **A.**    **Relator Is The Original Source Of Information And Evidence That JPMC Never Endorsed Any Notes Within Days Of Origination.**

             **1.**    *Relator's discoveries during his successful litigation in the John Riley Case: Relator discovers that WaMu notes were not endorsed within days of origination.*

In *Wells Fargo Bank, N.A., as trustee for WaMu Mortgage Pass Through Certificates Series 2005-PR4 Trust v. John Riley*, the Relator represented John Riley in a foreclosure proceeding concerning a loan originated on October 25, 2005, and foreclosed on June 16, 2010 (DE57, ¶ 105). JPMC filed a foreclosure complaint without any evidence of a Cynthia Riley rubber-stamped blank endorsement being affixed to the original promissory note (DE57, ¶ 106). In response to Mr. Jacobs' discovery request for evidence of an authorized blank endorsement, JPMC filed a discovery response with a copy of the mortgage note without the required endorsements

(DE57, ¶¶ 107-08). It also produced a note with a Cynthia Riley endorsement (DE57, ¶ 111). The trial court dismissed the case at the March 25, 2014 trial due to JPMC's failure to establish standing.

On September 23, 2016, JPMC re-filed the same foreclosure action with the Cynthia Riley stamp on the note attached to the complaint (DE57, ¶ 114). 115. On April 20, 2017, the trial court ordered the production of all documents showing how and when the endorsement on the note was affixed (DE57, ¶ 115). JPMC failed to comply, ultimately resulting in a final judgment (after trial) in favor of the defendant on grounds of unclean hands, in part because of JPMC's failure to provide documentary evidence establishing when and how the note was endorsed (DE57, ¶ 118).

Through that litigation, Mr. Jacobs discovered that there is no objectively verifiable evidence of JPMC's claim that WaMu had a practice of imaging and endorsing original notes using rubber-stamps within days of origination (DE57, ¶ 120).

### 2. *Relator's discoveries during deposition of Barbara Hindman of no evidence that JPMC endorsed notes in the Jacksonville, Secondary Delivery Department.*

While litigating JPMC's claim that WaMu endorsed notes within

days of origination, Mr. Jacobs investigated the department purportedly responsible for endorsing notes within dates of origination—the Jacksonville Secondary Delivery Department (DE57, ¶¶ 125-130). On June 23, 2020, JPMC presented Barbara Hindman to Relator as its corporate representative in *JPMC v. Mohammed* (DE57, ¶¶ 125-126). In 2004, Ms. Hindman worked for WaMu as part of its national post-closing team as a supervisor, in Jacksonville, Florida. Her department received the note, the mortgage, and original documents (DE57, ¶ 127). The notes would be imaged and passed on to Secondary Delivery (DE57, ¶ 127). Ms. Hindman never saw notes being endorsed (DE57, ¶ 128). She remembered the Secondary Delivery Department room, which JPMC claims was supposedly rubberstamping millions of notes with WaMu endorsements, being a "normal, quiet office environment." (DE57, ¶ 128). She did not recall any endorsement operations, rubberstamps, rubberstamp pads, or rubberstamping (DE57, ¶ 128).

She had been to the department at various times and recalled the room having 10 or 12 desks (DE57, ¶ 129). Cynthia Riley did not even have an office in that area (DE57, ¶ 129). Through her

testimony, Mr. Jacobs obtained original evidence that there endorsing of notes did not happen at all in the Secondary Delivery Department (DE57, ¶ 130).

### B. The Relator Is The Original Source Of Information That Testimony Given In State Court Foreclosure Proceedings Concerning The Endorsement Of Notes Was Coached And Fraudulent.

In the absence of physical evidence establishing the notes were endorsed before WaMu's collapse, JPMC relied on testimony from corporate representatives to prosecute its foreclosure cases. Significantly, JPMC does not produce and has not produced the Secondary Delivery Department employees who allegedly endorsed the millions of notes within days of origination (DE57, ¶ 133). JPMC instead produced corporate representatives who testified that Ms. Hindman told them that WaMu's policy was to scan the mortgage note into their electronic database and then endorse the note, but never scan an image of the properly endorsed note (DE57, ¶ 133).

Mr. Jacobs deposed Ms. Hindman (DE57, ¶ 130). She has no recollection of telling anyone about that alleged WaMu policy (DE57, ¶ 130). Through litigation against JPMC, Mr. Jacobs discovered that these claims and others by JPMC corporate representatives were

coached testimony not based on facts (DE57, ¶ 134).

> ### 1. *False testimony: that JPMC facilitated trainings in 2016 and 2018 on the Cynthia Riley endorsement attended by its corporate representatives.*

In *JPMorgan Chase v. Queen Mohammed*, Mr. Jacobs defended a foreclosure that relied on a Cynthia Riley WaMu endorsement (DE57, ¶ 135). The loan was originated on September 13, 2007, and JPMC produced a report showing the Mohammed note was scanned into WaMu's system the next month, on October 4, 2007 (DE57, ¶ 136). There was no endorsement on the October 4, 2007 scanned note (DE57, ¶ 136). The Docline Report showed the first image in JPMC's system of the Mohammed original note with a rubberstamped Cynthia Riley blank WaMu endorsement was January 20, 2010, long after WaMu ceased operations (DE57, ¶ 137).

In a January 26, 2018, deposition, JPMC produced Jeremy Summerford as a corporate representative, whom Mr. Jacobs personally deposed (DE57, ¶ 138). During the deposition, Mr. Summerfield acknowledged the absence of proof of an endorsement prior to WaMu's demise (DE57, ¶ 138). He further testified he did not know how Cynthia Riley's name got on the note: "I really don't know

anything surrounding Cynthia Riley and how those were placed by her on those notes." (DE57, ¶ 139)

Mr. Jacobs, however, uncovered that Mr. Summerford gave inconsistent testimony in a different case. In *U.S. Bank v. Jorge Llovet*, Summerford claimed he attended two PowerPoint trainings about the WaMu endorsements: one given by JPMC's outside counsel (Leon Cosgrove) in approximately 2016 and a second given by Vicky Weaver in 2018 (DE57, ¶ 144). According to Summerford, JPMC gave a PowerPoint presentation that WaMu imaged notes and endorsed them within days of origination (DE57, ¶ 145). Further, Summerford declared that Vicky Weaver trained JPMC's trial witnesses, instructing him that JPMC never used WaMu stamps to endorse original notes (DE57, ¶ 145).

Mr. Jacobs litigated this defense and proved contradictory statements of corporate representatives in multiple cases (DE57, ¶¶ 148-53). In subsequent litigation, when Mr. Jacobs sought a copy of the PowerPoint, JPMC filed a response that "No such PowerPoint presentations exist." (DE57, ¶ 151) On January 14, 2020, JPMC's outside counsel represented in court that his law firm never

21

presented a training for JPMC, including for Jeremy Summerford, regarding WaMu endorsements (DE57, ¶¶ 151-52).

>    ### 2.    *False testimony: Barbara Hindman personally saw notes endorsed within days of origination and communicated that to JPMC's testifying corporate representatives.*

Another claim presented in foreclosure proceedings was that Barbara Hindman, the former WaMu executive in charge of the Jacksonville Post-Closing Department from approximately 2004 to 2007, personally witnessed the endorsement of notes and communicated that to JPMC's corporate representatives in preparation for testimony (DE57, ¶ 154). Through his litigation, Mr. Jacobs again established this claim was untrue.

In *U.S. Bank Trust, NA v. Steve Piecznick*, Miami-Dade Circuit Case No. 2016-14544-CA-01, another of Relator's cases, JPMC was ordered to produce a corporate representative to testify at trial (DE57, ¶ 155). Pamela Bingham testified she prepared to testify for JPMC as the corporate representative by speaking with Barbara Hindman (DE57, ¶ 156). Ms. Bingham claimed that Ms. Hindman gave an eyewitness account of how WaMu endorsed original notes from across the nation (DE57, ¶ 157). Ms. Bingham testified that

according to Barbara Hindman, the WaMu standard operating procedure was for the Post Closing Department to receive original notes and image them, then walk the notes from the Post Closing Department next door to Cynthia Riley's Secondary Delivery Department which affixed the rubberstamped WaMu Cynthia Riley endorsements (DE57, ¶ 158). JPMC produced Vickie Weaver as a corporate representative who gave similar testimony about Ms. Hindman (DE57, ¶ 159).

But when the Relator deposed Ms. Hindman on June 23, 2020, in *JPMC v. Mohammed*, she recalled no such conversation with Ms. Bingham regarding her testimony as JPMC corporate representative (DE57, ¶ 160). She remembered the Secondary Delivery Department room that JPMC claims was rubberstamping millions of notes with WaMu endorsements, being a "normal, quiet office environment." (DE57, ¶ 161). She did not recall any endorsement operations, rubberstamps, rubberstamp pads, or rubberstamping (DE57, ¶ 161). So devastating was this deposition that JPMC initially declared her entire deposition confidential and filed a motion to deem the 400-page transcript confidential (DE57, ¶ 162).

### III. Personal Blogs Alleging That JPMC Used One Employee's Stamp To Endorse Mortgage Notes After Her Termination From JPMC.

In its motion to dismiss, JPMC submitted several blogs alleging an incorrect theory of fraud, that on some mortgage notes, JPMC used Cynthia Riley's signature stamp to endorse mortgage notes after her separation from JPMC in November 2006 (DE30). This theory incorrectly assumes any endorsements before November 2006 were not forgeries, when Jacobs showed they were all forgeries.

**Blog No. 1.** JPMC's first blog, dated January 21, 2014, alleged that thousands of WaMu mortgage notes were endorsed within days of origination using signature stamps bearing the name Cynthia Riley (DE30-1:4):

> Thousands of Washington Mutual Bank FA (WMBFA) mortgage Notes were endorsed in blank within days of when their mortgage loans closed, in the Note Review Department within WaMu's Secondary Delivery Operations. Thousands of WMBFA notes were stamp endorsed in blank allegedly by Cynthia Riley, a.k.a. Cindy Riley, as Vice President of Washington Mutual Bank, F.A.

The blog quotes testimony from Riley that the purpose of her Secondary Delivery Department was to prepare, endorse, and deliver loans to purchasers of the loans, including Fannie and Freddie

24

(DE30-1:4). According to Riley, once the notes were endorsed within days of origination, they were sent to the custodian vault (DE30-1:5). Riley stayed in this position until her termination in November 2006. The blog assumes that Secondary Delivery endorsed notes and only questions the legitimacy of mortgage notes endorsed in Riley's name that originated after November 2006 (DE30-1:5). This blog has apparently been removed and is not available on the internet.

**Blog No. 2.** JPMC's second blog *JPMorgan Chase Quits Foreclosure Battle 90 Minutes before Trial* similarly alleges that mortgage loans originated by WaMu after November 2006, with a Cynthia Riley note endorsement, are fraudulent because Cynthia Riley ceased working for JPMC in November 2006 (DE30-1:12). Discussing a mortgage note originated in November 2006, the blog claims it would be "impossible for Cynthia Riley to have the authority to stamp" a note that would have arrived in Secondary Delivery after November 2006 (DE30-1:12). The blog is not dated (DE30-1:10). The blog is filed under June 2015 (DE30-1:10).

**Blog No. 3.** After the court heard and ruled on JPMC's initial motion to dismiss, mid-litigation, JPMC found and produced a third

blog with its motion to dismiss the FAC, *JPMorgan Chase Alert! Can JPM-Chase Validate Your Mortgage?* (DE63-1:57). It is by the same blogger as Blog No. 2. It is also undated (DE63-1:57). It is filed under January 2020 DE63-1:57). The blog alleges that two-thirds of WaMu notes in foreclosure contain a Cynthia Riley endorsement stamp (DE63-1:60). It then alleges that nearly half the WaMu notes in foreclosure were created after November 2006 DE63-1:57), implying that the other half were consummated while Cynthia Riley was employed. All three blog posts accepted the WaMu endorsements on notes originated before November 2006 as legitimate, while the Relator established all rubber stamped WaMu endorsements were fraudulently affixed in violation of Fannie and Freddie guidelines.

## STANDARD OF REVIEW

An order dismissing a complaint for failure to state a claim under the False Claims Act is reviewed *de novo*, "accept[ing] the allegations in the complaint as true and constru[ing] them along with the reasonable inferences therefrom in the relator's favor." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The order dismissing the First Amended Complaint with prejudice should be reversed. JPMC received servicing fees and reimbursement for foreclosure costs from Fannie and Freddie. Its eligibility to receive these funds was contingent upon its compliance with the Fannie and Freddie servicing agreements, the Fannie and Freddie guidelines, and state and federal law. The FAC alleges, with particularity, that JPMC's fraudulent foreclosure practices rendered it ineligible to receive servicing fees and foreclosure costs reimbursements. The FAC further alleges the details of 14 sample false claims made by and paid out to JPMC.

The FAC alleges WaMu did not endorse its notes within days of origination, as JPMC has pertinaciously claimed in foreclosure proceedings (DE57, ¶ 102). Because of WaMu's failure to endorse notes within days of origination, when JPMC purchased WaMu after its collapse, JPMC obtained notes that did not comply with Fannie and Freddie servicing contract and guidelines (DE57, ¶¶ 14-17).

When JPMC learned of the noncompliance, it made no disclosures to Fannie and Freddie, either voluntarily or in the

27

required annual certifications (DE57, ¶¶ 23, 65, 67-68). JPMC instead attempted to remedy the problem by belatedly affixing WaMu endorsements years after WaMu ceased operations, using expired rubber signature stamps of former WaMu employees, with the intent to present the endorsements as the true signature of WaMu in foreclosure proceedings while coaching witnesses to falsely swear the signatures were made by WaMu (DE57, ¶¶ 72-74, 102). In so doing, JPMC breached its servicing agreement and violated the Fannie and Freddie guidelines and state and federal law. These allegations of noncompliance are pled with particularity based on information Mr. Jacobs uncovered over the course of the foreclosures he personally investigated and litigated against JPMC.

The three blogs presented by JPMC are not public disclosures. First, a blog, as a matter of law, is not "the news media." Second, the blogs' fraud allegations are not substantially the same as the FAC allegations. Regardless, Mr. Jacobs is an original source. The district court acknowledgement that Mr. Jacobs' litigation experiences "shed light on JPMC's efforts to cover up the alleged fraud scheme" and "signal circumstantial evidence supporting the credibility of whether

the fraud scheme occurred" confirms this (DE68:14-15). Mr. Jacobs' individual experiences litigating against JPMC expands the scope of the fraud. He brings to the case evidence of scienter not contained in the three anonymous blogs.

The order of dismissal should accordingly be reversed.

## ARGUMENT

The FAC alleges that JPMC was ineligible to receive servicing fees and reimbursements for foreclosure costs because of JPMC's noncompliance with Fannie and Freddie's servicing contract and guidelines, as well as state and federal law. The FAC presents both implied and express certification theories and a reverse False Claims Act theory.

Count I presents an express false certification FCA violation under § 3729(a)(1)(A)-(B) (DE57, ¶¶ 213-21). "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations that are prerequisites to Government payment in connection with the claim for payment of federal funds." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). *See United States*

*ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (adopting the express certification theory of liability).

Count II alleges implied false certification under § 3729(a)(1)(A)-(B) (DE57, ¶ 222-27). Supreme Court precedent establishes that an FCA claim may be based on a theory of implied false certification. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016). Liability attaches when "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement" and the failure to disclose this noncompliance is "material to the Government's payment decision." *Id.* at 1995-96.

Count III presents a reverse false claims violation under § 3729(a)(1)(G) (DE57, ¶ 228-32). Liability under the FCA also arises where a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999).

The district court erroneously dismissed the First Amended Complaint (FAC).

## I.  THE FIRST AMENDED COMPLAINT PLEADS AN FCA CLAIM WITH SUFFICIENT PARTICULARITY.

A complaint alleging FCA violations must comply with Rule 9(b), requiring fraud to be pled with particularity. The application of Rule 9(b), however, does not abrogate the concept of notice pleading embodied in Rule 8. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Rather, Rule 9(b)'s "particularity requirement ... must be read in conjunction with Federal Rule of Civil Procedure 8's directives that a complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief'" ... and that each averment of the complaint should be simple, concise, and direct." *Hill v. Morehouse Med. Assocs.*, No. 02-14429, 2003 U.S. App. LEXIS 27956, at *9 (11th Cir. Aug. 15, 2003) (internal citations omitted). *See United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F.Supp.2d 1027, 1033 (S.D. Fla. 2007).

As such, Rule 9(b) does not impose the level of detail required to prevail at trial. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 328 (2007). *See United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009) ("[A] procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial."); *Clausen*, 290 F.3d at 1313 ("a plaintiff is not expected to actually prove his allegations"). Nor does Rule 9(b) require that a plaintiff allege what they are not required to prove at trial. *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009). "A False Claims Act complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, **specifically the details of the defendants' allegedly fraudulent acts**, when they occurred, and who engaged in them." *Id.* at 1324 (internal citations omitted) (emphasis added).

Stated another way to the same effect, the Eleventh Circuit instructed that Rule 9(b)'s fraud particularity requirement is met as long as the complaint sets forth "(1) precisely what representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the

32

defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted).

"'Rule 9(b)'s ultimate meaning is context specific,' and thus there is no single construction of Rule 9(b) that applies in all contexts." *Grubbs*, 565 F.3d at 188 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). "Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard--it depends on the elements of the claim at hand." *Id.*

This Court's articulation of the distinct types of false claims in *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021), is illustrative. *Yates* explained that "a claim is false when it misrepresents the goods or services provided." It also noted that a "claim is also false when a person or entity fails to comply with statutory, regulatory, or contractual requirements but certifies that it has complied with them." *Id.* The type of fraud alleged necessarily impacts the pleading requirements. So, the reviewing court must

33

"evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006).

For example, when a falsity turns on the contents of individual claims, such as when the fraud is based on allegations that services were not provided as reflected on the bill (i.e., Medicaid billing fraud), the contents of individual claims may be required to adequately plead that false claims were actually presented. *See United States v. Health Mgmt. Assocs.*, 591 F. App'x 693, 708-09 (11th Cir. 2014) ("In those types of cases, representative claims with particularized medical and billing content matter more, because the falsity of the claim depends largely on the details contained within the claim form—such as the type of medical services rendered, the billing code or codes used on the claim form, and what amount was charged on the claim form for the medical services.").

In contrast, in an FCA case alleging an entire category of claims is false because of contractual noncompliance, the specifics of each payment request shed no light on the underlying fraud. "[T]he alleged

fraud 'does not depend as much on the particularized billing content of any given claim;' rather, 'improper [conduct] taint every claim submitted.'" *United States ex rel. Fla. Soc'y of Anesthesiologists v. Choudhry*, 262 F. Supp. 3d 1299, 1309-10 (M.D. Fla. 2017) (quoting *United States v. Health Mgmt. Assocs.*, 591 F. App'x 693, 708 (11th Cir. 2014)).

This case presents a textbook example of the importance of case-by-case application of Rule 9(b). None of the Relator's assertions are "speculative" or imagined but resulted from purposeful investigative efforts that were found to be substantial and verified by foreclosure courts. *See United States v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) ("speculative assertions that claims must have been submitted, were likely submitted or should have been submitted to the Government[ ]" are insufficient).

The FAC alleges JPMC was ineligible to receive servicing fees and foreclosure costs reimbursements due to its noncompliance with the Fannie and Freddie guidelines, the servicing contracts, and state and federal law. JPMC's noncompliance is alleged with particularity. The FAC identifies 14 different false claims in which JPMC made

demands for and received payment from the government.

JPMC endorsed mortgage notes originated by WaMu with rubber signature stamps of former WaMu employees, filed them in foreclosure proceedings, and coached its corporate representatives to falsely testify that WaMu endorsed the notes within days of origination (DE57, ¶¶ 68, 102, 180). The alleged fraudulent conduct represents serious violations of the Fannie and Freddie servicing contract, mandatory guidelines, and state and federal law.

To be sure, the use of someone else's signature without permission is forgery—a crime (DE57, ¶ 186). § 831.01, Fla. Stat. (perjury statute); *see McClendon v. State*, 290 So. 2d 77, 78 (Fla. 2d DCA 1974) ("The endorsement of a check may also be the subject of forgery" if the signature is "intended to be taken as the genuine signature of another"). Likewise, falsely swearing in different foreclosure proceedings that WaMu notes were endorsed within days of origination constitutes perjury (DE57, ¶ 175).

As the FAC alleges, JPMC's conduct violated the NMS settlement, wherein JPMC promised to comply with "Servicing Standards" that included requirements for presenting

36

documentation in foreclosure and bankruptcy cases (DE57, ¶ 183). Given its material noncompliance, JPMC was not eligible to receive servicing fees and foreclosure costs reimbursement. Yet, it failed to disclose its noncompliance and falsely certified compliance in its annual Form 16F (DE57, ¶¶ 65, 67).

Contrary to the district court analysis, details of JPMC's actual claims for payment to Fannie and Freddie are not germane to the Rule 9(b) analysis. To be sure, "which individual from JPMC submitted the claims to Fannie or Freddie" or the specific amount of servicing fee payments sheds no light on whether JPMC committed fraud in state court proceedings (DE68:7). Likewise, evidence regarding "'what' specific documents constituted 'claims' to Fannie or Freddie to receive those payments" does not make it more or less likely that JPMC engaged in fraudulent foreclosure practices (DE68:7). "A plaintiff must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts." *Health Mgmt. Assocs.*, 591 F. App'x at 709. Here, there should be no legitimate contention as to the particularity of the FAC's allegations of JPMC's fraudulent

37

foreclosure practices.

To meet *Clausen*'s indicia of reliability requirement, the Relator relies on his personal experience in foreclosure proceedings. A substantial portion of his practice has focused on debunking JPMC's claims in foreclosure litigation that WaMu endorsed notes within days of origination. The FAC presents but a sample of his extensive experience. For example, in *JPMorgan Chase v. Queen Mohammed*, Mr. Jacobs defended a foreclosure that relied on a Cynthia Riley WaMu endorsement (DE57, ¶57, ¶ 135). The loan was originated on September 13, 2007, and Mr. Jacobs secured a Docline report from JPMC showing the Mohammed note was scanned into WaMu's system a month later, on October 4, 2007 (DE57, ¶ 136). There was no endorsement on the October 4, 2007 scanned note (DE57, ¶ 136). The Docline Report further showed the first image in JPMC's system of the Mohammed original note with a rubberstamped Cynthia Riley blank WaMu endorsement was January 20, 2010, long after WaMu ceased operations (DE57, ¶ 137).

For John Riley's mortgage, JPMC failed to foreclose the mortgage in two separate foreclosure actions brought on the same

note because of JPMC's persistent failures to establish that WaMu—as opposed to JPMC—endorsed the note (DE57, ¶¶ 113, 118).

In numerous court cases, Mr. Jacobs has proven the falsity of various claims by JPMC corporate representatives about the grounds for their testimony that WaMu notes were endorsed within days of origination (DE57, ¶ 134). For instance, several JPMC corporate representative claimed in multiple foreclosure proceedings that Barbara Hindman, the former WaMu executive in charge of the Post-Closing Department, told them WaMu's practice was to endorse notes within days of origination (DE57, ¶¶ 156-59). But Ms. Hindman, in her depositions with Mr. Jacobs, recalled no such conversations (DE57, ¶ 160). In fact, she never saw notes being endorsed within days of origination using a rubber stamp (DE57, ¶ 161). She remembered the Department that JPMC claims was purportedly rubber-stamping millions of notes with WaMu endorsements within days of origination, being a "normal, quiet office environment." (DE57, ¶ 161). So damaging was this deposition that JPMC initially declared this entire deposition confidential and filed a motion to deem the 400-page transcript confidential (DE57, ¶ 162).

The breadth of the Relator's knowledge of JPMC's foreclosure practices is undisputed.[1] Even the district court order acknowledges that Mr. Jacobs' litigation experiences "shed light on JPMC's efforts to cover up the alleged fraud scheme" and "signal circumstantial evidence supporting the credibility of whether the fraud scheme occurred." (DE68:14-15). The district court erred, however, in finding the Relator's allegations of fraudulent foreclosure practices were merely conclusory (DE68:8). Jacobs' experience showed the blogs wrong on much of the facts concerning the false claims.

Still, even if payment details were required—and they are not in this type of FCA case—the FAC alleges with particularity the who, what, where, when, and how as to payment details (DE68:7-8). Consider the particularity concerning representative sample Loan F106Q1235608 (DE57-3:2):

> Who: JPMC
> What: Submitted Claims for the following:
>     Servicing Fees Payments: $2,859.29
>     Foreclosure Costs Payments: $5,488

---

[1] The district court's finding that Mr. Jacobs was an original source in similar litigation against Bank of America is detailed in the Omnibus Order denying a motion to dismiss in *Jacobs v. Bank of America*, U.S. District Case No. 1:15-cv-24585-UU, 2017 WL 1261943 (S.D. Fla., March 21, 2017). That court's description of Mr. Jacobs' unique, firsthand information is descriptive of his extensive scope of original information.

> Property Preservation Costs Payments: $31,718
> Miscellaneous Expenses Payments: $1,312
> Tax Payments: $15,332
> When: From June 1, 2012, to July 1, 2014[2]

The district court conclusion that the FAC only alleges that "JPMC submitted claims for various enumerated kinds of fees and costs" is unsupported by the record (DE68:7).

The FAC goes far beyond the minimum requirements of Rule 9(b) by informing JPMC of the exact nature of the fraudulent conduct it is called to defend in court. The dismissal with prejudice must be reversed.

## II.   THE DISTRICT COURT ERRED IN FINDING A PUBLIC DISCLOSURE OF FRAUD SUBSTANTIALLY SIMILAR TO THE ALLEGATIONS OF FRAUD ALLEGED IN THE FAC.

The second basis on which the district court granted the motion to dismiss was "because the allegations forming the substance of [Jacobs'] FCA claims were previously disclosed to the public through multiple blog articles and thus are barred by the FCA's public disclosure provision and that Mr. Jacobs' litigation did not substantially add to the allegations of fraud. 31 U.S.C. §

---

[2] As before, none of these details make JPMC's compliance and entitlement to fees and costs more, or less, likely. And trial evidence of these payment details would not meet the falsity requirement of an FCA violation.

41

3730(e)(4)(A)." (DE68:9).

The court's conclusion is incorrect in three respects. First, internet blogs are not "news media" within the meaning of the False Claims Act statute and cannot be relied upon as a prior source. Second, the blog postings do not constitute prior disclosure because they are materially and substantively different from the false claims discovered by the Relator and made a part of the FAC. Third, Mr. Jacobs is an original source notwithstanding any information contained in a blog posting.

### A.    The District Court Erred In Interpreting The False Claims Act's Public Disclosure Provision To Apply To Internet Blog Posts As Within The Meaning Of "News Media."

First, the district court finding that a blog, as a matter of law, is "new media" was error. Blogs are not news media within the meaning of the False Claims Act statute and cannot be relied upon as a prior source. The statutory provision upon which the district court relied to find that internet blog postings amounted to "public disclosure" is the provision applicable to "news media" publications. As will be demonstrated, internet blogs cannot be and construed as and are not "news media" within the meaning of the False Claims Act

because, when the Act was amended by Congress to refer to "news media" disclosures, there was no such thing as internet blogs and the Act must be construed in light of the words used in the statute at the time of its enactment and the meaning of "news media" when the statute was adopted.

Subsection (e)(4)(a)(iii) of section 3730 provides (emphasis added):

> (e) Certain actions barred.
>
>      *   *   *
>
> (4)
>
> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) ***from the news media***

The district court erred in automatically equating internet blogs to "the news media" publications because, when the False Claims Act was amended by Congress to first refer to the effects of "news media" publications, there was no such thing as public internet, much less blog postings that could be considered sources for news; like the

then-existing network and cable television programs, newspapers, radio broadcasts, magazines, and other existing outlets for reporting events of the day.

The Supreme Court has recognized on numerous occasions that statutes must be construed in light of the meaning of their words common at the time of enactment, not at the time of application:

> [W]hile legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: ***Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption*** or might mean something different in another context. And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally. To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, ***this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence***. For example, in the context of the National Motor Vehicle Theft Act, this Court admitted that the term "vehicle" in 1931 could literally mean "a conveyance working on land, water or air." *McBoyle v. United States*, 283 U. S. 25, 26, 51 S. Ct. 340, 75 L. Ed. 816 (1931). But given contextual clues and "everyday speech" at the time of the Act's adoption in 1919, this Court concluded that "vehicles" in that statute included only things "moving on land," not airplanes too. *Ibid*. Similarly, in *New Prime*, we held that, while the term "contracts of employment" today might seem to encompass

44

only contracts with employees, at the time of the statute's adoption the phrase was ordinarily understood to cover contracts with independent contractors as well. 586 U. S., at ___-___, 139 S. Ct. 532, 202 L. Ed. 2d 536 (slip op., at 6-9).

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1750 (2020).

In *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018), the Court held that the Railroad Retirement Tax Act of 1937, which taxed "monetary remuneration," did not operate to impose a tax upon employee stock options. "The government argues that stock options like these qualify as a form of taxable 'money remuneration' under the Act because stock can be easily converted into money. The railroads reply that stock options aren't 'money' at all and remind us that when Congress passed the Act it sought to mimic existing industry pension practices that generally took no notice of in-kind benefits." *Id.* at 2069.

The Court in *Wisconsin Central* rejected the government's position that stock options were taxable, based largely on its determination that the definition of "money" did not include such compensation when the statute was enacted:

> We start with the key statutory term: "money remuneration." As usual, our job is to interpret the words

consistent with their "ordinary meaning … **at the time Congress enacted the statute**." *Perrin v. United States*, 444 U. S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979). And when Congress adopted the Act in 1937, "money" was ordinarily understood to mean currency "issued by [a] recognized authority as a medium of exchange." Webster's New International Dictionary 1583 (2d ed. 1942); *see also* 6 Oxford English Dictionary 603 (1st ed. 1933) ("In mod[ern] use commonly applied indifferently to coin and to such promissory documents representing coin (esp. government and bank notes) as are currently accepted as a medium of exchange"); Black's Law Dictionary 1200 (3d ed. 1933) (in its "popular sense, 'money' means any currency, tokens, bank-notes, or other circulating medium in general use as the representative of value"); *Railway Express Agency, Inc. v. Virginia*, 347 U. S. 359, 365, 74 S. Ct. 558, 98 L. Ed. 757 (1954) ("[M]oney … is a medium of exchange"). Pretty obviously, **stock options do not fall within that definition**.

*Id.* at 2070-71 (emphasis added).

Commanding precedents stand for this inarguable proposition. *E.g.*, *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.") (emphasis added); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

meaning.... Therefore, ***we look to the ordinary meaning of the term bribery' at the time Congress enacted the statute*** in 1961.") (emphasis added).

The first statutory reference to "news media" in the False Claims Act appeared in the 1986 amendments, Pub. L. No. 99-562, 100 Stat. 3153 (1986). "Reflecting the view that private parties should be encouraged to prosecute fraud not known by the government, Congress set a ten percent recovery limit for suits arising from information publicly available through the news media or a government report." Comment, Francis E. Purcell, Jr., *Qui Tam Suits Under the False Claims Amendments Act of 1986: The Need for Clear Legislative Expression*, 42 Cath. U.L. Rev. 935, 945 (Summer 1993).

Prior to amendments to the False Claim Act in 1943, a private relator could bring suit thereunder even when the suit was based on information and evidence obtained from the federal government. *United States, ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943). The 1943 amendments prohibited federal court jurisdiction over suits based upon information or evidence in the possession of the federal government at the commencement of the suit. S. Rep. No. 291, 78th

Con. 1st Sess. 1 (1943). "In 1986, Congress set out to revise the False

Claims Act to enhance the ability of the federal government to

prosecute fraud effectively and to provide an incentive for private

citizens with knowledge of fraud to expose the violations." Purcell

Comment at 945. Congress considered those alternatives concerning

*qui tam* litigation involving information that was the subject of news

media reports:

> The 1986 Amendments removed the prior restrictions and broadened the statutory language to enable those individuals with knowledge of the false claims to bring a qui tam suit. The original Senate bill retained the bar on parasitical suits based on information disclosed by the government in the course of a separate action, by a congressional investigation, or in the news media. The bill did, however, allow a relator to base a suit on publicly-disclosed information if the government had not taken action within six months. The Senate subsequently amended the bill's language, splitting the jurisdiction section to add an "original source" requirement. The original source requirement barred suits based on information publicly disclosed through government sources or the media unless the party bringing the suit had direct and independent knowledge of the information and had informed the government of his knowledge. ***Later changes to the bill's "original source" language removed the exemption for information disclosed through the news media***.

Purcell Comment at 950-51 (emphasis added).

Representative Berman, a sponsor of the 1986 amendments,

explained the original source language: "A person is an original source if he had some of the information related to the claim which he made available to the government or the news media in advance of the false claims being publicly disclosed. This person has the right to bring an action after these disclosures are made public as long it is filed before an action is commenced by the Government." 132 Cong. Rec. 29322 (1986).

Of course, there was no publicly available internet in 1986, much less any such thing as a "blog." Nor did the district conduct an evidentiary hearing on the availability of and ready access to the blogs at issue. The term "blog" does not appear at all in the 1993 edition of *Websters Third New International Dictionary of the English Language* (Unabridged). *See* page 236 (definitions from "block" to "blood.") The earliest published references to "blog" are from 1997:

> 1997 - The word "blog" is shortened from weblog by Peter Merholz. He says he will call them "wee blogs." The term "weblog" is coined by Jorn Barger (Blood).
> - Slashdot - url is http://slashdot.org/: began in September 1997. "... the granddaddy or a school of web filter sites that some are calling meme trackers: A memetracker is a tool for studying the migration of memes across a group of people. The term is typically used to describe web sites that either:
> 1.Analyze blog posts to determine what web pages are

49

being discussed or cited most often on the World Wide
Web, or
2. Allow users to vote for links to web pages that they find
of interest" (From meme trackers, Wikipedia).

http://www.u.arizona.edu/~vanduzer/Blogging/Bloghistory.html.

Although previously permitted to bring *qui tam* actions based
on "news media" reports (albeit with a ten percent limit on the
relator's recovery in such actions), the statute was thereafter
amended to preclude recovery in such cases based upon news media
accounts of false claims, unless the relator was the original source.
The 1992 version of the False Claims Act provided:

> (4)(A) No court shall have jurisdiction over an action
> under this section based upon the public disclosure of
> allegations or transaction in a criminal, civil, or
> administrative hearing, in a Congressional,
> administrative, or Government Accounting Office report,
> hearing, audit, or investigation, ***or from the news media***,
> unless the action is brought by the Attorney General or the
> person bringing the action is an original source of the
> information.

31 U.S.C. §3730(e)(4)(A) (1992) (emphasis added).

Nothing in the legislative history of the False Claims Act
indicates Congress ever considered including internet blogs—that
would not even begin to appear until five years later—in the 1992
reference to "news media." Thus, Congress could not have intended

the term "news media" to include online blogs. In line with this, courts have consistently excluded blogs from the category of "news media." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F. Supp. 3d 416, 425 (D. Del. 2014), *overruled on other grounds by United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries*, LLC, 812 F.3d 294, 300 (3d Cir. 2016) ("Similarly, the blog postings (e.g., BitterEnd blog and Sea Fever blog) are not 'news media.'"); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012) (expressing its disinclination to "conclude that in the age of basement blogging and ease of publishing, any medium that disseminates information to the public in a periodic manner is part of the "news media").

The district court erroneously dismissed this action based on the statutory misinterpretation that the blog postings referenced here, as a matter of law, constituted "news media" accounts sufficient to disqualify the Relator from bringing this action. That determination is not consistent with precedent and could only occur, if at all, upon consideration of evidentiary presentations that did not occur.

**B.    The Allegations Of Fraud Contained In The Blogs Are Not Substantially Similar To The Allegations Of Fraud Presented In This Case.**

A matter of law determination that internet blogs are news media does not lead to affirmance of the dismissal order because the allegations presented in the anonymous blogs are not "substantially the same" as the allegations in the amended complaint. The FCA's plain text allows dismissal only "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed ... from the news media." 31 U.S.C. § 3730(e)(4)(A).

The ordinary meaning of "substantial" is: "concerning the essentials of something." *The New Oxford American Dictionary* 1687 (2d ed. 2005). And the ordinary meaning of "same" is: "identical; not different; unchanged" or "of an identical type." *Id.* at 1498. Put together, "substantially the same," requires JPMC to establish that the essentials of the Relator's allegations are identical to or of an identical type as the allegations alleged in the blogs. *See United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 748 n.12 (10th Cir. 2019) (discussing the plain meaning of the terms "substantial" and "same"). JPMC fails to meet both requirements.

First, under *United States v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1353 (11th Cir. 2021), the anonymous blogs fail to meet the definition of "same," because their fraud allegations are not identical to those alleged in this complaint. The *Mortg. Invs. Corp.* Court applied the D.C. Circuit's *Springfield* formula for identifying the allegations of fraud relevant to a public disclosure analysis:

> Under that formula, "one generally must present a submitted statement or claim (X) and the true set of facts (Y), which shows that X is untrue. These two things together allow the conclusion (Z) that fraud has occurred." *United States ex rel. Saldivar v. Fresenius Med. Care Holdings*, Inc., 841 F.3d 927, 935 (11th Cir. 2016) (citing *Springfield*, 14 F.3d at 654). There is no allegation of fraud under this formula unless each variable is present. "[W]here only one element of the fraudulent transaction is in the public domain (e.g., X), the qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (e.g., Y) or allegations of fraud itself (e.g., Z)." Springfield, 14 F.3d at 655.

*Mortg. Invs. Corp.*, 987 F.3d at 1353-54.

Applied to this case, the blogs' fraud allegation are as follows:

- X – JPMC filed mortgage notes originated after November 2006 with Cynthia Riley's endorsements in foreclosure proceedings.
- Y – Cynthia Riley did not work for WaMu after November 2006.
- Z – Therefore, WaMu mortgage notes originated after November 2006 with a Cynthia Riley endorsement are

fraudulent.

These are not the fraud allegations presented in the FAC. The complaint's fraud allegations center on JPMC's unlawful receipt of funds for which it was ineligible to receive. The *Springfield* formula applied to the FAC allegations confirm the blogs' dissimilarity:

- X – JPMC received servicing fees and reimbursement costs for foreclosure actions from Fannie and Freddie.
- Y – JPMC was ineligible to receive these costs and fees due to its noncompliance with the Fannie and Freddie guidelines and servicing contracts.
- Z – Therefore, JPMC made a false claim.

Second, and more fundamentally, the essentials facts of the Relator's fraud claim are not identical to the blogs' allegations of fraud. This is partly due to the blogs' reliance on the premise, rejected and disproven by Mr. Jacobs' litigation, that WaMu endorsed its notes within days of origination. Accepting JPMC's representations in court, the blogs allege that only the mortgage notes originated *after* Cynthia Riley left WaMu in 2006 are fraudulent.

Mr. Jacobs rejects JPMC's claim that WaMu endorsed its mortgage notes within days of origination. Mr. Jacobs has seen the electronic records establishing that copies of notes scanned months and years after origination were not endorsed. He discredited

testimony from JPMC corporate representatives as to the basis for this testimony. As such, his complaint alleges that mortgage notes originating both **before** and **after** Cynthia Riley left WaMu are fraudulent, as well as mortgage notes with endorsements by Jess Almanza, Brenda F. Brendle, Michele Mullholand, or Robin E. Tange (DE57, ¶ 65.e.). Mr. Jacobs is also the original source connecting the coached and fraudulent foreclosures to false claims to Fannie and Freddie.

Cooper and Osheroff, leading cases in the Eleventh Circuit, illuminate the boundaries of the substantial similarity requirement. In *Cooper*, the Court applying the former, more stringent "based on information publicly disclosed" rule, determined that the complaint allegations **were not** based on information publicly disclosed. There, the FCA complaint alleged that Blue Cross Blue Shield of Florida (BCBSF), instead of paying insurance claims it was required to pay, submitted those claims to Medicare. *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 564 (11th Cir. 1994). BCBSF presented a GAO report that criticized "BCBSF's plan for monitoring payments to hospitals under the [Medicare Secondary Payer] laws and note[d] a

potential conflict of interest when BCBSF is also a primary insurer for the working aged. *Id.* On motion to dismiss, BCBSF contended that the suit was based on this disclosure. The Court rejected the contention "because [the GAO report] discussed the defendant 'only in the context of its role as an intermediary responsible for monitoring payment to hospitals' **and not** 'in its capacity as a primary insurer,' which was the focus of the complaint." *United States v. Humana, Inc.*, 776 F.3d 805, 814 (11th Cir. 2015) (quoting *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 567 (11th Cir. 1994)) (emphasis added).

Similarly, in *United States ex rel. Patel v. GE Healthcare, Inc.*, No. 8:14-cv-120-T-33TGW, 2017 U.S. Dist. LEXIS 159562, at *10 (M.D. Fla. Sept. 28, 2017), the complaint allegations were not substantially similar to allegations publicly disclosed in a prior FCA case. The district court reasoned that the prior FCA case "challenged GE's practices as a manufacturer, claiming that that GE encouraged healthcare providers to inject excess radioactivity into Myoview at the providers' offices in order to obtain additional doses." In contrast, the Relator's "action alleges that GE itself injected excess radioactivity,

in GE's capacity as a nuclear pharmacy." *Id.*

These cases contrast with *Osheroff*'s determination that the complaint allegations **were** "substantially the same as" the publicly disclosed allegations. The FCA complaint alleged that a medical clinic violated Medicare's Anti-Kickback statute by offering services without regard for medical purpose or financial need and by offering services whose value was more than nominal. The Court's public disclosure analysis relied on a *Miami Herald* article stating that clinic "patients get Ritz-Carlton treatment" and that the clinic's free services were "paid for by taxpayer dollars." *Id.* at 814. The Court reasoned that these allegations were sufficient to raise an inference of government fraud. *Id.*

JPMC's anonymous blogs in this litigation are more analogous to the blogs rejected by the Eleventh Circuit in *Cooper*. The anonymous blogs address conduct in JPMC's capacity as a private banking institution. The FAC, on the other hand, addresses conduct in the context of JPMC's capacity as a servicer of Fannie and Freddie-backed loans and alleges violations of the servicing agreement and GSE guidelines. In contrast, the anonymous blogs do not discuss any

submission of claims to Freddie and Fannie or otherwise claim that the loans were Fannie and Freddie-backed loans serviced by JPMC. Even more significant, the blogs do not allege that taxpayers funded JPMC's illegal foreclosure practices. Indeed, unlike *Osheroff*, JPMC does not contend that it has been publicly disclosed that taxpayer dollars were used to fund JPMC's foreclosure practices.

## III. THE DISTRICT COURT ERRED IN FINDING THAT THE RELATOR IS NOT AN ORIGINAL SOURCE OF INFORMATION.

Finally, even if anonymous blogs constitute public disclosures, there should be no contention that the Relator is not an "original source."

Under Section 3730(e)(4)(B)(2), an "original source" means a person with knowledge "that is independent of and materially adds to the publicly disclosed allegations." *United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1323 (M.D. Fla. 2017). "Materiality in this setting requires the claimant to show it had information '[o]f such a nature that knowledge of the item would affect a person's decision-making,' is 'significant,' or is 'essential.' *United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S.*

*Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) (quoting *Black's Law Dictionary* 1124 (10th ed. 2014)).

"[A] relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: the who, what, when, where and how of the events at issue." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (internal citations omitted). The Eleventh Circuit has required that the "information [be] more than background information" that adds details to already publicly disclosed information. *Cooper*, 19 F.3d at 568 n.12; *Osheroff*, 776 F.3d at 815 (explaining that background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status under the previous version of the statute).

The district court order agreed that Mr. Jacobs, through his practice, had independent knowledge of JPMC's alleged fraud (DE68:14-15). For example, the district court agreed that Mr. Jacobs "add[ed] new allegations regarding purported fabricated and coached

59

testimony occurring in various state court foreclosure proceedings," which "shed light on JPMC's efforts to cover up the alleged fraud scheme." (DE68:14). The district court further agreed that Mr. Jacobs' evidence that Ms. Hindman "testified that she did not personally witness the endorsement of notes, whereas JPMC corporate representative witnesses testified that Hindman did in fact witness the endorsement of notes" were allegations that "signal circumstantial evidence supporting the credibility of whether the fraud scheme occurred." (DE68:15).

Furthermore, whereas the blogs allege the fraudulent use of **Cynthia Riley's** stamp on WaMu loans originated *after* November 2006, the FAC adds that mortgage notes originated *before* Cynthia Riley left WaMu are fraudulent, as well as mortgage notes with endorsements by Jess Almanza, Brenda F. Brendle, Michele Mullholand, or Robin E. Tange (DE57, ¶ 65.e.).

The district court finding that Mr. Jacobs' independent knowledge did not materially add to the blog's allegations is erroneous (DE68:14-16). The FAC allegations expand "the scope of the fraud revealed in the public disclosures and introduce[]

60

knowledge of scienter that is not specifically contained in a qualifying public disclosure." *Reed*, 923 F.3d at 762.

## CONCLUSION

Given that the district court erred in dismissing the complaint with prejudice, this Court must vacate and remand this case with instructions to deny dismissal or allow the Relator to amend the complaint consistent with the controlling authority discussed here.

## CERTIFICATE OF COMPLIANCE

I CERTIFY that the foregoing brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. It is printed in Bookman Old Style and contains 11,545 words as counted by MS Word.

Respectfully submitted,

BENEDICT P. KUEHNE
MICHAEL T. DAVIS
KUEHNE DAVIS LAW, P.A.
100 SE 2D STREET, SUITE 3105
MIAMI, FL 33131-2154
MDAVIS@KUEHNELAW.COM
BEN.KUEHNE@KUEHNELAW.COM
EFILING@KUEHNELAW.COM

THE LS LAW FIRM
LSANCHEZ@THELSFIRM.COM

ROY D. WASSON
WASSON & ASSOCIATES, CHARTERED
COURTHOUSE PLAZA—SUITE 600
28 WEST FLAGLER STREET
MIAMI, FL 33130
ROY@WASSONANDASSOCIATES.COM
E-SERVICE@WASSONANDASSOCIATES.COM

BRUCE JACOBS
JACOBS LEGAL PLLC
EFILE@JAKELEGAL.COM

COURT KEELEY, P.A.
CK@COURTKEELEY.COM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on October 12, 2022.

By: _S/ Benedict P. Kuehne_
**BENEDICT P. KUEHNE**
Florida Bar No. 233293