# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

### CASE NO. 22-10963-GG

_____

UNITED STATES OF AMERICA,
EX REL. BRUCE JACOBS,
PLAINTIFF/APPELLANT,
v.

JPMORGAN CHASE BANK N.A.,
DEFENDANT/APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

APPELLANT'S PETITION FOR REHEARING AND REHEARING *EN BANC*

_____

BENEDICT P. KUEHNE
MICHAEL T. DAVIS
KUEHNE DAVIS LAW, P.A.
100 SE 2D STREET, SUITE 3105
MIAMI, FL 33131-2154
MDAVIS@KUEHNELAW.COM
BEN.KUEHNE@KUEHNELAW.COM

THE LS LAW FIRM
LSANCHEZ@THELSFIRM.COM

COURT KEELEY, P.A.
CK@COURTKEELEY.COM

ROY D. WASSON
WASSON & ASSOCIATES,
CHARTERED
COURTHOUSE PLAZA—SUITE 600
28 WEST FLAGLER STREET
MIAMI, FL 33130
ROY@WASSONANDASSOCIATES.COM
E-SERVICE@WASSONANDASSOCIATES.COM

## CERTIFICATE OF INTERESTED PERSONS/CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellant certifies the following persons and entities may have an interest in this case:

Boese, Andrew B.

Cannon, Aileen M., U.S. District Judge

Cosgrove, Scott B.

Court Keeley, P.A.

Davis, Michael T.

Dmitrovsky, Susan

Dos Santos, Johan

Enenstein Pham & Glass, LLP

Jacobs, Bruce

JPMorgan Chase & Co. (NYSE: JPM)

JP Morgan Chase Bank, N.A.

Keeley, Court E.

Kuehne, Benedict P.

Kuehne Davis Law, P.A.

Leon Cosgrove LLC

Martens, Matthew T.

Morales, Anna C.

Otazo-Reyes, Alicia M., U.S. Magistrate Judge

Pham, Teri T.

Sanchez, Lily Ann

Schoenfeld, Alan E.

The LS Law Firm

Torres, Edwin G., U.S. Magistrate Judge

Vanguard Group, Inc.

Wasson and Associates, Chartered

Wasson, Roy D.

Weinberg, Benjamin

Weinkle, James A.

Williams, Kathleen M., U.S. District Judge

Wilmer Hale

## STATEMENT OF COUNSEL

In compliance with 11th Cir. R. 35-5, the undersigned certifies:

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following precedents of the Supreme Court and this Circuit and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court: *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 419, 131 S. Ct. 1885, 1897 (2011).

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Attorney of Record for
Appellant Bruce Jacobs

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS/CORPORATE DISCLOSURE STATEMENT ...........................................................C1

STATEMENT OF COUNSEL ............................................................ i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................. iii

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE AND FACTS ....................................... 1

PETITIONER FOR REHEARING AND REHEARING *EN BANC* ............................................................................................. 7

    I.    The Court's continuing expansion of the term "from the news media" conflicts with the plain meaning construction required by *Schindler Elevator Corp. v. United States ex rel. Kirk,* 563 U.S. 401, 419, 131 S. Ct. 1885, 1897 (2011). ................................................... 7

    II.    Under *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 568 (11th Cir. 1994), the Relator was an original source because he acquired his knowledge before the purported public disclosure. ....................................... 16

CONCLUSION ............................................................................. 20

CERTIFICATE OF COMPLIANCE ................................................. 20

CERTIFICATE OF SERVICE.......................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731, 1750 (2020) ................................................... 13

*Cooper v. Blue Cross & Blue Shield*,
  19 F.3d 562 (11th Cir. 1994)................................. ii, 1, 16, 17, 18

*Graham Cty. Soil & Water Conser. Dist. v. United States ex rel.
  Wilson*, 559 U.S. 280, 290, 130 S. Ct. 1396, 1404 (2010) ........... 9

*McBoyle v. United States*,
  283 U. S. 25, 51 S. Ct. 340, 75 L. Ed. 816 (1931)....................... 13

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ............................................................. 15

*Perrin v. United States*,
  444 U. S. 37, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979).......... 14, 15

*Railway Express Agency, Inc. v. Virginia*,
  347 U. S. 359, 74 S. Ct. 558, 98 L. Ed. 757 (1954).................... 14

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  563 U.S. 401, 131 S. Ct. 1885 (2011)............................. i, 7, 8, 11

*United States ex rel. Butler v. Magellan Health Servs.*,
  74 F. Supp. 2d 1201 (M.D. Fla. 1999) ........................................ 19

*United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*,
  113 F.4th 1294 (11th Cir. 2024) ......................................... *Passim*

*United States ex rel. Osheroff v. Humana, Inc.*,
  776 F.3d 805 (11th Cir. 2015)............................... 9, 10, 11, 17, 19

*United States ex rel. Reed v. Keypoint Gov't*,
  923 F.3d 729 (10th Cir. 2019).................................................... 20

*United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-cv-571-T-33TBM,
   2009 U.S. Dist. LEXIS 27646, at *22 (M.D. Fla. Mar. 20, 2009)..19

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ......................................................... 13, 14

**Statutes**

Pub. L. No. 99-562, 100 Stat. 3153 (1986) ................................... 15

**Other Authorities**

*Qui Tam Suits Under the False Claims Amendments Act of 1986: The Need for Clear Legislative Expression,*
   42 Cath. U.L. Rev. 935 (Summer, 1993)................................ 15-16

## STATEMENT OF THE ISSUES

I.    Should this Circuit continue to hold that health clinics, anonymous bloggers, and anyone who publicly disseminates information online qualify as "the news media" under the False Claims Act, or shall this Circuit employ the plain and ordinary meaning of the term "the news media"?

II.    Under *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 568 (11th Cir. 1994), is the Relator an original source, because his knowledge predates the posting of the purported public disclosures and establishes JPMC's *scienter*?

## STATEMENT OF THE CASE AND FACTS

Since 2008, Plaintiff/Appellant Bruce Jacobs ("Relator"), a foreclosure attorney, has defended against foreclosure actions initiated by various banks (DE57, ¶ 104). In *Jacobs v. Bank of America*, U.S. District Case No. 1:15-cv-24585-UU, 2017 WL 1261943 (S.D. Fla., March 21, 2017), he was identified as an original source in a similar False Claims Act ("FCA") litigation against Bank of America. In this FCA case, he claims that Defendant/Appellee JPMorgan Chase Bank, N.A. ("JPMC") "concocted a scheme to forge

1

endorsements on millions of loans using signature stamps bearing the names of previous Washington Mutual ('WAMU') employees—like Cynthia Riley—years after Washington Mutual's collapse." *United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, 113 F.4th 1294, 1298 (11th Cir. 2024). These fraudulent practices disqualified JPMC from participating in the Fannie Mae and Freddie Mac servicing program, and JPMC's false certification of compliance constituted actionable false claims.

The Relator's First Amended Complaint outlines his extensive foreclosure litigation against JPMC, challenging Cynthia Riley's endorsement on WAMU-originated notes and uncovering JPMC's efforts to hide the fact that it fraudulently-used her endorsement stamp (DE57, ¶¶ 104-74). This history, beginning in 2011 (DE57, ¶ 107), predates the blogs from 2014, 2015, and 2020 that JPMC submitted in support of dismissal under the public disclosure bar.

In *Wells Fargo Bank, N.A., as trustee for WaMu Mortgage Pass Through Certificates Series 2005-PR4 Trust v. John Riley*, the Relator litigated a foreclosure on a WAMU loan originated on October 25, 2005, while Cynthia Riley was still employed by Washington Mutual

2

(DE57, ¶ 105). The Relator requested JPMC produce the endorsed note and assignment (DE57, ¶ 107). On January 25, 2012, JPMC produced a mortgage note without an endorsement (DE57, ¶ 108). The Relator then secured a court order requiring JPMC to provide all documents related to the loan's purchase and sale, as well as its acquisition of the note (DE57, ¶ 109). Although JPMC missed the deadline, it eventually produced a note with a Cynthia Riley endorsement on June 19, 2013, marking the first appearance of this endorsement in the three-year litigation. This June 19, 2013, ligation regarding the validity of the Cynthia Riley endorsement predated the publication of the anonymous blogs submitted by JPMC.

At the *John Riley* foreclosure trial on March 25, 2014, the Relator argued for involuntary dismissal of the foreclosure action because JPMC could not prove the note was properly endorsed by Cynthia Riley (DE57, ¶ 112). The trial court agreed, dismissing the case due to JPMC's failure to prove its standing to sue on the WAMU-originated loan (DE57, ¶ 113).

On September 23, 2016, JPMC refiled the *John Riley* foreclosure action, this time attaching a note with Cynthia Riley's endorsement

3

to the complaint (DE57, ¶ 114). On April 20, 2017, the court ordered JPMC to produce documents detailing how and when the endorsement was added (DE57, ¶ 115). JPMC failed to comply, and on December 13, 2017, the Relator secured a second final judgment in favor of the homeowner (DE57, ¶ 118). The court found JPMC failed to provide evidence regarding the timing and method of the endorsement and had acted with unclean hands by presenting fraudulent evidence and false testimony (DE57, ¶ 118).

In foreclosure proceedings against the Relator, JPMC claimed WAMU endorsed notes within days of origination but failed to produce any employee who did so (DE57, ¶ 132-33). Instead, JPMC relied on corporate representatives who asserted this was WAMU's practice (DE57, ¶¶ 132-33). During depositions of these corporate representatives, the Relator exposed materially conflicting testimony in several cases (DE57, ¶¶ 107-75). The district court acknowledged that these accounts "shed light on JPMC's efforts to cover up the alleged fraud scheme" and provided "circumstantial evidence supporting the credibility of whether the fraud scheme occurred" (DE68:14-15). This Court further recognized the Relator's allegations

that JPMC "covered up its scheme by coaching witnesses and suborning perjury." *Jacobs*, 113 F.4th at 1298.

For example, in *JPMorgan Chase v. Queen Mohammed*, a JPMC representative claimed to have learned about WAMU's practices from PowerPoint trainings allegedly conducted by JPMC's outside counsel (DE57, ¶ 144). However, after a court order to produce the PowerPoints, JPMC admitted no such PowerPoint presentations existed, and its outside counsel confirmed no such training was ever given (DE57, ¶ 151).

In *U.S. Bank Trust, NA v. Steve Piecznick*, another JPMC representative testified she learned about WAMU's practices from Barbara Hindman, who allegedly witnessed endorsements (DE57, ¶¶ 156-58). However, when deposed by the Relator, Hindman denied this conversation and stated she never witnessed any endorsements (DE57, ¶¶ 160-61).

On motion to dismiss, JPMC submitted several anonymous blogs in support of dismissal under the False Claim Act's public disclosure bar. These blogs were published long after the Relator had already challenged the validity of Cynthia Riley's endorsement

5

(DE30-1:5, 10; DE63-1:57). The earliest, dated January 21, 2014, questioned endorsements on notes originated after November 2006, asserting they must be fraudulent since Riley left WAMU that year (DE30-1:5). The blogs present generalized claims of fraud that fail to meet Rule 9(b)'s particularity requirement (DE30-1:5, 10; DE63-1:57). Furthermore, as the panel decision noted, the blogs do not allege violations of the FCA. *Jacobs*, 113 F.4th at 1302.

Furthermore, the blogs were written by anonymous individuals, and JPMC provided no information regarding the identities of the authors. One blog, dated January 21, 2014, was published on a foreclosure information-sharing site aimed at helping homeowners avoid foreclosure. The other two articles, dated June 2015 and January 2020, appeared on "MFI-Miami," a website focused on mortgage fraud investigations. JPMC presented no evidence to establish that these bloggers had credentials or affiliations with recognized news media, nor did JPMC attempt to verify their qualifications or standing in the journalism field.

On review of the order dismissing the complaint with prejudice, the Court concluded the public disclosure bar applied for two

6

reasons. First, the Court concluded that the blog was "news media."

Second, the Court concluded the Relator was not an original source.

This petition for rehearing follows.

**PETITIONER FOR REHEARING AND REHEARING *EN BANC***

I.   **The Court's continuing expansion of the term "from the news media" conflicts with the plain meaning construction required by *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 419, 131 S. Ct. 1885, 1897 (2011).**

Subsection 3730(e)(4)(A)(iii) of the False Claims Act's public

disclosure bar is limited in scope, applying only to three specific types

of public disclosures (emphasis added):

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
> **(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> **(ii)** in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> **(iii)** *from the news media*

The "news media" provision is relevant here, requiring dismissal

only if the allegations were publicly disclosed "from the news media."

The term "news media" is not defined in the Act. But the Supreme

7

Court, in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011), instructed that undefined terms in the False Claims Act must be interpreted according to their plain and ordinary meaning.

In the two decisions submitted for *en banc* consideration, panels of this Court departed from the plain meaning analysis required by *Schindler Elevator Corp.* After concluding that "publicly available websites . . . intended to disseminate information . . . qualify as news media," *Jacobs*, 113 F.4th at 1301 (11th Cir. 2024), the panels classified a health clinic's website and then an anonymous blog as disclosures "from the news media."

This Circuit's solidified definition of "news media" now encompasses any publicly available website intended to disseminate information, necessarily including publicly available social media pages and even the Court's own public website, because they are intended to publicly disseminate information. This broad interpretation has made the term "from the news media" applicable to nearly all internet content, effectively swallowing what was intended to be a public disclosure bar limited to three discrete

8

categories. The Relator seeks *en banc* review to restore the proper application of the plain and ordinary meaning of the term "from the news media," as required by *Schindler Elevator Corp.*

In *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 815 (11th Cir. 2015), a panel of this Court first extended the public disclosure bar to include information from the defendant health clinic's website, reasoning that the website was intended to publicly disseminate information. This broad interpretation reasoned that a publicly accessible website qualified as "the news media" even though ordinary people would not call information from their health clinic a disclosure "from the news media":

> Because the term "news media" has a broad sweep, we conclude that the newspaper advertisements and the clinics' publicly available websites, which are intended to disseminate information about the clinics' programs, qualify as news media for purposes of the public disclosure provision

*Id.* at 813. In coming to this conclusion, the panel relied on a passing reference by the Supreme Court in *Graham Cty. Soil & Water Conser. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290, 130 S. Ct. 1396, 1404 (2010), to the "news media" disclosure bar having a broad

sweep (emphasis added):

> When we consider the entire text of the public disclosure bar, the case for limiting "administrative" to federal sources becomes significantly weaker. **The "news media" referenced in Category 3 plainly have a broader sweep**. The Federal Government funds certain media outlets, and certain private outlets have a national focus; but no one contends that Category 3 is limited to these sources.

The Supreme Court in *Graham Cty. Soil & Water Conser. Dist.*, however, was not asked to apply or define the "from the news media" exception. Furthermore, since the plain and ordinary meaning of "from the news media" is already broad in itself, the application of *Graham* did not require that the disclosure "from the news media" bar extend to entities like health clinics that are plainly not the news media.

Most recently, in this appeal, *Jacobs*, 113 F.4th at 1301, a panel of the Court ruled that *Osheroff*'s analysis was not dicta, was binding, and applied its logic to an anonymous blog. The panel concluded the blogs were also disclosures "from the news media" because the bloggers intended to publicly disseminate information:

> But Jacobs's argument still fails because we held in *Osheroff* that "news media" under the FCA isn't limited to traditional news reporting methods—the key question is

10

> whether a website is "publicly available" and "intended to disseminate information" to the public. *Id.* Under that standard, the blogs at issue here are just as clearly "news media" as the company websites we addressed in *Osheroff*. These blogs—no matter their precise size or sweep—are publicly available websites that bill themselves as disseminating foreclosure-related and mortgage-related information to the public.

The panel implicitly acknowledged that "publicly available" social media websites such as Facebook, Instagram, and Twitter, which are also "intended to disseminate information" to the public, could come within *Osheroff*'s definition. But the panel determined it need not address this issue:

> Because there is nothing private or personal about these blogs, we need not address whether the term "news media" under the FCA covers a private or personal social media page.

The *en banc* court should address this issue, course correct, and require a plain and ordinary meaning analysis of the term "from the news media" as required by *Schindler Elevator Corp.*

First, no reasonable person would interpret "from the news media" to include anyone who posts on a public website. Since *Osheroff* in 2015, it has become clear that ordinary people do not view online posts as information "from the news media." If this

11

interpretation continues, then everyone with internet access—including those peddling misinformation and disinformation—would be considered part of the news media.

Second, this Court's line of cases erroneously equate internet websites and blogs to "the news media" because, when the False Claims Act was amended by Congress to first exclude public disclosures "from the news media," the public internet did not even exist, much less blog postings that could be posted by the news media such as network television programs, newspapers, radio broadcasts, magazines, and other such publicly available and disseminated outlets for the news media to report events of the day.

> [W]hile legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: ***Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption*** or might mean something different in another context. And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally. To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, ***this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence***. For example, in

the context of the National Motor Vehicle Theft Act, this Court admitted that the term "vehicle" in 1931 could literally mean "a conveyance working on land, water or air." *McBoyle v. United States*, 283 U. S. 25, 26, 51 S. Ct. 340, 75 L. Ed. 816 (1931). But given contextual clues and "everyday speech" at the time of the Act's adoption in 1919, this Court concluded that "vehicles" in that statute included only things "moving on land," not airplanes too. *Ibid*. Similarly, in *New Prime*, we held that, while the term "contracts of employment" today might seem to encompass only contracts with employees, at the time of the statute's adoption the phrase was ordinarily understood to cover contracts with independent contractors as well. 586 U. S., at ___-___, 139 S. Ct. 532, 202 L. Ed. 2d 536 (slip op., at 6-9). *Cf*. post, at ___ - ___, 207 L. Ed. 2d, at 322-323 (KAVANAUGH, J., dissenting) (providing additional examples).

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1750 (2020).

In *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018), the Supreme Court held that the Railroad Retirement Tax Act of 1937, which taxed "monetary remuneration," did not operate to impose a tax upon employee stock options. "The government argues that stock options like these qualify as a form of taxable 'money remuneration' under the Act because stock can be easily converted into money. The railroads reply that stock options aren't 'money' at all and remind us that when Congress passed the Act it sought to mimic existing

industry pension practices that generally took no notice of in-kind benefits." *Id.* at 2069.

The Court in *Wisconsin Central* rejected the government's position that stock options were taxable, based largely on its determination that the definition of "money" did not include such compensation ***when the statute was enacted***:

> We start with the key statutory term: "money remuneration." As usual, our job is to interpret the words consistent with their "ordinary meaning . . . ***at the time Congress enacted the statute***." *Perrin v. United States*, 444 U. S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979). And when Congress adopted the Act in 1937, "money" was ordinarily understood to mean currency "issued by [a] recognized authority as a medium of exchange." Webster's New International Dictionary 1583 (2d ed. 1942); *see also* 6 Oxford English Dictionary 603 (1st ed. 1933) ("In mod[ern] use commonly applied indifferently to coin and to such promissory documents representing coin (esp. government and bank notes) as are currently accepted as a medium of exchange"); Black's Law Dictionary 1200 (3d ed. 1933) (in its "popular sense, 'money' means any currency, tokens, bank-notes, or other circulating medium in general use as the representative of value"); *Railway Express Agency, Inc. v. Virginia*, 347 U. S. 359, 365, 74 S. Ct. 558, 98 L. Ed. 757 (1954) ("[M]oney . . . is a medium of exchange"). Pretty obviously, ***stock options do not fall within that definition***.

*Id.* at 2070-71 (emphasis added).

14

Many other cases stand for the same proposition. *E.g.*, *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning ***at the time Congress adopted them***.") (emphasis added); *Perrin v. United States*, 444 U.S. 37, 42; 100 S. Ct. 311, 314 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. . . . Therefore, ***we look to the ordinary meaning of the term 'bribery' at the time Congress enacted the statute*** in 1961.") (emphasis added).

The first statutory reference to disclosures from the news media in the False Claims Act was in the 1986 amendments, Pub. L. No. 99-562, 100 Stat. 3153 (1986). "Reflecting the view that private parties should be encouraged to prosecute fraud not known by the government, Congress set a ten percent recovery limit for suits arising from information publicly available through the news media or a government report." Comment, Francis E. Purcell, Jr., *Qui Tam Suits Under the False Claims Amendments Act of 1986: The Need for*

15

*Clear Legislative Expression*, 42 Cath. U.L. Rev. 935, 945 (Summer, 1993).

Of course, there was no publicly available internet in 1986, much less any such thing as a "blog." The term "blog" does not appear at all in the 1993 edition of *Websters Third New International Dictionary of the English Language* (Unabridged). *See* page 236 (definitions from "block" to "blood.").

The legislative history of the False Claims Act contains no indication Congress ever considered including internet blogs—which would not even begin to appear until years later—in its reference to disclosures "from the news media." Thus, Congress could not have intended the term "from the news media" to include online blogs, and the district court improperly dismissed this action based on the erroneous statutory interpretation that the blog postings referenced here constituted disclosures "from the news media" accounts sufficient to disqualify the Relator from bringing this action.

**II.    Under *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 568 (11th Cir. 1994), the Relator was an original source because he acquired his knowledge before the purported public disclosure.**

16

The Relator seeks panel rehearing on the issue of whether he qualifies as an original source. While the panel decision acknowledged Mr. Jacobs' extensive knowledge of JPMC's foreclosure practices, it concludes that he is not an original source under *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 815 (11th Cir. 2015). However, the panel overlooked a critical and undisputed fact: the Relator's knowledge predates the blogs. He had been litigating the issues raised in the anonymous blogs years before they were posted (DE57, ¶ 108). This was a key fact in this Court's analysis in *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 568 (11th Cir. 1994):

### *C. Cooper was an Original Source*

The record shows Cooper acquired his knowledge of BCBSF's alleged wrongdoing through three years of his own claims processing, research, and correspondence with members of Congress and HCFA. Three weeks before the hearing in which an OIG inspector announced it was investigating BCBSF at HCFA's request, Cooper had asked HCFA to act against BCBSF. Thus, his knowledge was direct. And it was obtained independently of the allegations disclosed at the hearing. That he filed suit shortly after the hearing does not change this circumstance. *See Prudential,* 944 F.2d at 1160 (it is not necessary for relator to have all relevant information to qualify as "independent"); *see also 1990 Implementation Hearing,* at 3 (Because of original source exception, "a party with knowledge of fraud against government should

17

be able to maintain a *qui tam* action as long as he had some of the information in advance of the public disclosure.") (Statement of Sen. Grassley). Cooper qualifies as an original source under section 3730(e) (4) (B). The district court erred in finding the suit was barred.

The Relator's knowledge of JPMC's foreclosure practices at issue in this case is virtually indistinguishable. In 2012, the Relator was regularly challenging the legitimacy of mortgage notes with Cynthia Riley's endorsement, well before the blogs posted in 2014, 2015, and 2020. The 2020 blog was potentially posted just weeks before the Relator filed this lawsuit. It is undisputed that the Relator "acquired his knowledge of [JPMC]'s alleged wrongdoing through [two] years of his own" foreclosure litigation against JPMC. *Cooper*, 19 F.3d at 562. Like *Cooper*, "his knowledge was direct[,] [a]nd it was obtained independently of the allegations disclosed" in the anonymous blogs. *Id.* at 568.

The panel should reevaluate its analysis in light of this, as well as *Cooper*'s reliance on Senator Grassley's statement that "a party with knowledge of fraud against the government should be able to maintain a qui tam action as long as he had some of the information in advance of the public disclosure."

18

Multiple courts agree that a relator whose information predates the purported public disclosure qualifies as an original source. For instance, in *United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-cv-571-T-33TBM, 2009 U.S. Dist. LEXIS 27646, at *22 (M.D. Fla. Mar. 20, 2009), the court held the relator was an original source because the relators "personally observed Defendants' conduct for at least three years prior to any public disclosure." Similarly, in *United States ex rel. Butler v. Magellan Health Servs.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999), the court held the relator was an original source where "[t]he state court complaint as well as the information to the media [the purported public disclosures] was disclosed by his own prerogative."

Furthermore, the district court concluded that the Relator's information "add[s] new allegations regarding purported fabricated and coached testimony occurring in various state court foreclosure proceedings," which "shed light on JPMC's efforts to cover up the alleged fraud scheme." (DE68:14). This met *Osheroff*'s materiality requirement since the blogs do not allege FCA violations, much less JPMC's *scienter*.

19

In *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 762 (10th Cir. 2019), the Relator materially added to publicly disclosed information, because his information expanded "the scope of the fraud revealed in the public disclosures and introduce[d] knowledge of scienter."

In light of this, the panel should reconsider its determination that the Relator is not an original source.

## CONCLUSION

This Court should grant panel rehearing and rehearing *en banc*.

## CERTIFICATE OF COMPLIANCE

I CERTIFY that the foregoing brief complies with the type-volume limitation set forth in Rule 32(a) (7) (B) of the Federal Rules of Appellate Procedure. It is printed in Bookman Old Style and contains 3,878 words as counted by MS Word.

Respectfully submitted,

20

**BENEDICT P. KUEHNE**
**MICHAEL T. DAVIS**
**KUEHNE DAVIS LAW, P.A.**
100 SE 2D STREET, SUITE 3105
MIAMI, FL 33131-2154
MDAVIS@KUEHNELAW.COM
BEN.KUEHNE@KUEHNELAW.COM
EFILING@KUEHNELAW.COM

**THE LS LAW FIRM**
LSANCHEZ@THELSFIRM.COM

**COURT KEELEY, P.A.**
CK@COURTKEELEY.COM

**ROY D. WASSON**
**WASSON & ASSOCIATES, CHARTERED**
COURTHOUSE PLAZA—SUITE 600
28 WEST FLAGLER STREET
MIAMI, FL 33130
ROY@WASSONANDASSOCIATES.COM
E-SERVICE@WASSONANDASSOCIATES.COM

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on October 15, 2024.

By:    *S/ Benedict P. Kuehne*
       **BENEDICT P. KUEHNE**
       Florida Bar No. 233293

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10963

_____

UNITED STATES OF AMERICA,
Ex Rel.,

                                                              Plaintiff,

BRUCE JACOBS,
Relator,

                                                  Plaintiff-Appellant,

*versus*

JP MORGAN CHASE BANK, N.A.,

                                                  Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-20543-AMC

———————————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER,
Circuit Judges.

BRASHER, Circuit Judge:

This appeal requires us to enforce the False Claims Act's public disclosure bar. The FCA's public disclosure bar provides that a "court shall dismiss an [FCA] action or claim . . . if substantially the same allegations . . . as alleged in the action or claim were publicly disclosed . . . from the news media." 31 U.S.C. § 3730(e)(4)(A). This prohibition does not apply if "the action is brought by the Attorney General or the person bringing the action is an original source of the information." *Id.*

The district court dismissed Bruce Jacobs's *qui tam* action against JP Morgan Chase Bank, N.A., under Federal Rule of Civil Procedure 12(b)(6). It did so for two reasons. First, it concluded that his amended complaint did not plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Second, it concluded that the gravamen of his fraud claims had already been disclosed on three blogs and that he was not an original source of that information. We need not address Rule 9 because, even if Jacobs pleaded fraud with sufficient particularity, we agree with the

district court that the FCA's public disclosure bar independently forecloses this lawsuit. Therefore, we affirm the district court's dismissal of Jacobs's amended complaint.

## I.

Bruce Jacobs, a Florida foreclosure attorney, brought this *qui tam* action against JP Morgan Chase on behalf of the United States. Jacobs alleges that JP Morgan Chase violated the False Claims Act by forging mortgage loan promissory notes and submitting false reimbursement claims to Fannie Mae and Freddie Mac, government-sponsored enterprises, for loan servicing costs. JP Morgan Chase acquired these promissory notes from Washington Mutual in 2008 after it had collapsed and the FDIC had placed it into receivership. Washington Mutual had previously sold the loans it originated to Fannie Mae and Freddie Mac, and JP Morgan Chase became Washington Mutual's successor-in-interest and the new servicer of these loans.

Jacobs alleges that Washington Mutual forgot to endorse every loan it originated, a violation of federal guidelines, which if discovered would have required it and its successor-in-interest JP Morgan Chase to repurchase the mortgages from Fannie and Freddie or to remit make-whole payments. The lack of proper endorsement, Jacobs asserts, also would have prevented JP Morgan Chase from conveying good and marketable title to Fannie and Freddie in the event of foreclosure and from seeking reimbursement for loan servicing costs. According to Jacobs, JP Morgan Chase concocted a scheme to forge endorsements on millions of loans using

signature stamps bearing the names of previous Washington Mutual employees—like Cynthia Riley—years after Washington Mutual's collapse. Jacobs alleges that JP Morgan Chase, despite its knowing and willful noncompliance with federal guidelines, submitted payment claims to the federal government totaling hundreds of millions of dollars for loan servicing costs it incurred on the Washington Mutual loans. He also alleges that JP Morgan Chase covered up its scheme by coaching witnesses and suborning perjury.

In February 2020, Jacobs sued JP Morgan Chase for violating the False Claims Act. The district court dismissed that complaint without prejudice under Federal Rule of Civil Procedure 12(b)(6), concluding that Jacobs didn't meet the heightened fraud pleading requirements of Federal Rule of Civil Procedure 9(b). The district court also flagged that Jacobs must properly plead that he was an original source of the allegations under the FCA's public disclosure bar but didn't rule on it. The district court gave Jacobs a final opportunity to amend his complaint.

In his amended complaint, Jacobs asserted three violations of the False Claims Act by JP Morgan Chase: (1) express false certification under 31 U.S.C. § 3729(a)(1)(A)–(B); (2) implied false certification under 31 U.S.C. § 3729(a)(1)(A)–(B); and (3) reverse false claim under 31 U.S.C. § 3729(a)(1)(G). His amended complaint describes federal guidelines for government-sponsored enterprises and includes new exhibits of representative loans and payment claims. Jacobs's amended complaint alleges that JP Morgan Chase

foreclosed on mortgages "secured by forged and falsely stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WaMu ceased to exist using rubber stamps of Cynthia Riley's signature[] and others['] [signatures]."

This time, the district court dismissed the lawsuit with prejudice under Rule 12(b)(6) on two grounds. First, the district court again concluded that Jacobs failed to state a claim because he failed to allege JP Morgan Chase's fraud with sufficient particularity under Rule 9(b). Second, the district court concluded that the FCA's public disclosure provision independently bars Jacobs's lawsuit because online blog articles from before the lawsuit allege that employees would use Cynthia Riley's and other Washington Mutual employees' rubber stamps to fraudulently endorse the loan promissory notes.

The district court took judicial notice of three specific online blog articles. One blog article published on January 21, 2014, was found on "[a] foreclosure information sharing site committed to saving homes from foreclosure." The other two articles appeared in June 2015 and January 2020 on "MFI-Miami," a website about mortgage fraud investigations. All three blog articles mentioned JP Morgan Chase's alleged fraudulent stamping scheme and questioned the validity of the endorsements on the Washington Mutual loans. The blog posts disclosed details related to Cynthia Riley—giving details about how she had left her employment with Washington Mutual before a note was stamped, providing a photograph of one of her stamps, and calling the note endorsement fraudulent.

One of these blogs discussed how in 2012 during other litigation JP Morgan Chase "miraculously found the missing endorsed note" containing Cynthia Riley's stamp even though Riley had left Washington Mutual's employment before the example mortgage closed—an allegation of fraud on the court. And before this lawsuit was filed, another one of these blogs stated that JP Morgan Chase was "stamping the[] Washington Mutual notes with the Cynthia Riley endorsement stamp between 2012 and 2014" as part of its foreclosure efforts.

Based on the blog articles, the district court concluded that substantially the same information as the allegations in the complaint had been publicly disclosed in the news media before Jacobs's lawsuit and concluded that Jacobs wasn't an original source of the information, requiring dismissal under the FCA's public disclosure bar. Jacobs appealed.

## II.

We review *de novo* a district court's decision on a motion to dismiss and any questions of statutory interpretation, including the application of the FCA's public disclosure bar. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 809 (11th Cir. 2015).

## III.

The district court decided this appeal on two alternative grounds, but we need address only one. Even if Jacobs's amended complaint pleads fraud with particularity under Federal Rule of

Civil Procedure 9(b), he cannot support an FCA claim because of that act's public disclosure bar.

"One of the FCA's primary purposes is to encourage individuals knowing of government-related fraud to come forward with that information." *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993), as amended (Jan. 12, 1994) (citation omitted). It follows that a relator cannot bring an FCA claim with substantially the same allegations as "allegations that are already publicly disclosed" in the "news media" unless the relator is an original source of that information. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1353 (11th Cir. 2021) (citing 31 U.S.C. § 3730); *see also* 31 U.S.C. § 3730(e)(4)(A). Without this public disclosure bar, "opportunistic relators—with nothing new to contribute—could exploit the FCA's *qui tam* provisions for their personal benefit." *Bibby*, 987 F.3d at 1353 (emphasis added) (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).

To that end, the FCA provides that we "shall dismiss an [FCA] action or claim . . . , unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . from the news media." 31 U.S.C. § 3730(e)(4)(A). This prohibition does not apply if "the action is brought by the Attorney General or the person bringing the action is an original source of the information." *Id.* "For purposes of this paragraph, 'original source' means an individual who" was a whistleblower to the government of the information in the allegations before the public disclosure or "who has knowledge

that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." *Id*. § 3730(e)(4)(B).

The district court took judicial notice of three online blog articles that recount allegations about JP Morgan Chase's deceptive use of Washington Mutual signature stamps to forge mortgage endorsements. Jacobs correctly does not contest the district court's decision to take judicial notice of these websites at the motion to dismiss stage. *See Osheroff*, 776 F.3d at 811–16 (concluding that the district court could take judicial notice of news articles during the three-part public disclosure bar test at the motion to dismiss stage); *see also id*. at 811 n.4 ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."). He argues only that they do not warrant dismissing his amended complaint under the public disclosure bar.

We use a three-part test to determine whether the FCA's public disclosure bar applies. *See id*. at 812 (citing *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)). We begin by asking whether "the allegations made by the plaintiff [have] been publicly disclosed." *Id*. (quoting *Cooper*, 19 F.3d at 565 n.4). If the answer is "yes," we ask whether "the allegations in the complaint are 'substantially the same' as . . . allegations or transactions contained in public disclosures." *Id*. (quoting 31 U.S.C.

§ 3730(e)(4)). If the answer to that question is also "yes," we ask whether "the plaintiff [is] an 'original source' of that information." *Id.* (quoting *Cooper*, 19 F.3d at 565 n.4).

We address each part of our test in turn.

*A.*

First, we must determine whether the three blogs "publicly disclosed" allegations "from the news media" prior to this lawsuit. 31 U.S.C. § 3730(e)(4)(A); *see also Osheroff*, 776 F.3d at 812. There are two issues here. The first issue is one of timing—whether these blog posts were publicly disclosed before the suit. The second issue is whether these blog posts count as "news media" under the statute.

The timing issue is easily resolved. One blog article was published on January 21, 2014, on "[a] foreclosure information sharing site committed to saving homes from foreclosure." The other two articles were published in June 2015 and January 2020 on "MFI-Miami," a website about mortgage fraud investigations. It is undisputed that all three articles were publicly available online before Jacobs filed his initial complaint in February 2020.

The second issue is more complicated. Jacobs argues that these articles do not qualify as "news media" under the plain and ordinary meaning of that term. But Jacobs's argument is inconsistent with our precedent. We have held that the term "news media" in section 3730(e)(4)(A) "has 'a broad[] sweep.'" *Osheroff*, 776 F.3d at 813 (alteration in original) (quoting *Graham Cnty. Soil &*

*Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)) (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011)). And we have specifically concluded that "publicly available websites . . . intended to disseminate information . . . qualify as news media for purposes of the public disclosure provision." *See id.*

Jacobs argues that our statements in *Osheroff* about publicly available websites are dicta. We disagree. In *Osheroff*, the plaintiff's complaint "allege[d] that [] [several health] clinics offered [] services without regard for medical purpose or financial need and that the value of the services is more than nominal"—an alleged violation of federal law. *Id.* at 808. The defendants, including three health clinics, submitted public pages of the clinics' websites with information about the clinics' free programs to establish that the information was publicly available in the "news media" before the suit. *See id.* at 807–08, 813. We held that "publicly available websites . . . intended to disseminate information" are "news media" under the FCA. *Id.* at 813. This statement was not dicta because it was necessary to our decision in *Osheroff* in step one of our test: we had to decide whether the company website in *Osheroff* counted as "news media," and we answered that question in the affirmative.

Finally, Jacobs argues that the company websites in *Osheroff* are distinguishable from the blogs in this case because these blogs are merely individual-run accounts that broadcast the personal views of their authors. Again, we disagree. To be sure, Jacobs is correct that we did not hold in *Osheroff* that *all* websites are "news

media." But Jacobs's argument still fails because we held in *Osheroff* that "news media" under the FCA isn't limited to traditional news reporting methods—the key question is whether a website is "publicly available" and "intended to disseminate information" to the public. *Id.* Under that standard, the blogs at issue here are just as clearly "news media" as the company websites we addressed in *Osheroff.* These blogs—no matter their precise size or sweep—are publicly available websites that bill themselves as disseminating foreclosure-related and mortgage-related information to the public. Because there is nothing private or personal about these blogs, we need not address whether the term "news media" under the FCA covers a private or personal social media page.

In short, we conclude that the blog articles "qualify as news media" under the FCA's public disclosure bar and had been "publicly disclosed" before Jacobs's suit. *Id.* at 813–14.

*B.*

Second, because we conclude that these blogs publicly disclosed their allegations in the news media, we next must ask whether "the allegations in the complaint are 'substantially the same' as . . . allegations or transactions contained in public disclosures." *Id.* at 812 (quoting 31 U.S.C. § 3730(e)(4)). This part of the test is "a quick trigger to get to the more exacting original source inquiry." *Id.* at 814 (quoting *Cooper*, 19 F.3d at 568 n.10). "[S]ignificant overlap between [the plaintiff]'s allegations and the public disclosures is sufficient to show that the disclosed information forms

the basis of th[e] lawsuit and is substantially similar to the allegations in the complaint." *Id.*

Jacobs contends that his allegations are not substantially the same as the ones in the blog articles because they are not identical. The argument is that because "substantially" means "the essentials of something" and because "same" means "identical," "substantially the same" means "identical." That argument fails as a matter of logic and because it disregards the FCA's plain text and our precedent. We have explained that "substantially the same" does not mean *identical*, as Jacobs argues, but "significant overlap." *Id.* In this Circuit, "[t]he language of our laws is the law." *CBS Inc. v. Prime-Time 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001). If "substantially the same" meant "identical," the statute would say "same." We must give effect to the actual words Congress used.

All three blog articles significantly overlap with the allegations in Jacobs's complaint. They all mention JP Morgan Chase's alleged fraudulent stamping scheme and question the validity of the endorsements on the Washington Mutual loans. The blogs even disclose details about a specific Washington Mutual employee named in the complaint, Cynthia Riley. The blogs discuss how Cynthia Riley left her employment with Washington Mutual before a note was stamped, include a photograph of one of her stamps, and allege that the note endorsement was fraudulent. One blog article questions whether the notes endorsed by Cynthia Riley that JP Morgan Chase had produced in foreclosure cases were "fake or a possible act of fraud." Another blog article implies that JP

Morgan Chase had something to do with this fraud by discussing how in 2012, during other litigation, JP Morgan Chase "miraculously found [a] missing endorsed note" containing Cynthia Riley's stamp even though Riley had left Washington Mutual's employment before the mortgage closed and would not have had a note to stamp. The third blog article goes further—explicitly alleging that JP Morgan Chase was "stamping the[] Washington Mutual notes with the Cynthia Riley endorsement stamp" as part of its foreclosure efforts.

The content of these blog articles significantly overlaps with Jacobs's allegations. Like the blog articles, Jacobs's amended complaint alleges that JP Morgan Chase foreclosed on mortgages "secured by forged and falsely stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WaMu ceased to exist using rubber stamps of Cynthia Riley's signature[] and others['] [signatures]."

To be sure, these articles do not specifically allege False Claims Act fraud. They are mostly about committing fraud on the court in foreclosure proceedings. But Jacobs's key allegations of fraudulent activity have significant overlap with the three blog articles. It is important in the Rule 9(b) context for an FCA complaint to contain details about the submission of a false claim to the government. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). But under the "substantially the same" standard, those details don't matter for purposes of the public disclosure bar. Our case law requires significant overlap, not that a mirror image of the

complaint's allegations had been publicly disclosed. Therefore, the information disclosed in the blog articles is substantially the same as the allegations in Jacobs's lawsuit.

*C.*

Third, because the complaint's allegations are substantially the same as the ones in the blog articles, the FCA's public disclosure bar prohibits Jacobs's lawsuit unless he can establish that he is an "original source" of that information. 31 U.S.C. § 3730(e)(4)(A); *see also Osheroff*, 776 F.3d at 812 (quoting *Cooper*, 19 F.3d at 565 n.4). As relevant here, an "original source" is an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided that information to the government before filing the suit. 31 U.S.C. § 3730(e)(4)(B).

Jacobs posits that he falls within the original source exception because his law practice gave him independent knowledge of JP Morgan Chase's fraud. Thus, the argument goes, the amended complaint materially adds to the public disclosures from the blog articles. We disagree.

If the public disclosures are "already sufficient to give rise to an inference" of fraud, cumulative allegations do "not materially add to the public disclosures." *Osheroff*, 776 F.3d at 815 (citing *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014)). "[B]ackground information [and details] that help[] one understand or contextualize a public disclosure is insufficient to grant original source status" under the FCA. *Id.* The

original source doctrine "increase[s] private citizen involvement in exposing fraud" but "prevent[s] opportunistic suits by private persons who heard of fraud but played no part in exposing it." *Id.* at 815–16 (quoting *Cooper*, 19 F.3d at 565).

No doubt, Jacobs's experience from his law practice has shed light on how JP Morgan Chase defends certain foreclosure actions and allowed him to call into question the endorsements of some specific Washington Mutual loans. But his litigation against JP Morgan Chase has not provided him with independent information to corroborate his stamping scheme theory or his allegation that JP Morgan Chase submitted false claims to the government. Nor does the amended complaint materially add to the core claims in the blog articles—that JP Morgan Chase fraudulently endorsed Washington Mutual promissory notes to strengthen its legal position in foreclosure proceedings.

Jacobs also argues that he alleges a broader fraud than the blog articles because the amended complaint questions the validity of every Washington Mutual loan acquired by JP Morgan Chase and alleges a cover-up scheme. And he observes that the blog articles do not mention Fannie, Freddie, or false reimbursement claims by JP Morgan Chase. In this way, Jacobs argues that he is an original source of the FCA claims because in another lawsuit he deposed a JP Morgan Chase representative who said that JP Morgan Chase sold the loan to Fannie Mae. Again, we disagree.

The additional allegations about the government-services enterprises and JP Morgan Chase's potential FCA violations as well

as the cover-up scheme merely supplement and contextualize the core fraud hypothesis in the blog articles. As discussed above, the blog articles don't give just general information. They discuss details and explicitly allege fraud. The blog articles are "already sufficient to give rise to an inference" of fraud, so the additional information Jacobs claims to have provided does "not materially add to the public disclosures." *Id.* at 815 (citing *Kraxberger*, 756 F.3d at 1079). The publicly revealed information about the so-called stamping scheme gives rise to the inference of FCA fraud because we can infer from the blog articles' details that there was general fraud, which led to false submissions to the government—defeating Jacobs's position that he is an original source of the information. *See id.* (citing *Kraxberger*, 756 F.3d at 1079); *see also id.* at 808, 815 (holding that pre-suit news media allowed an inference that the defendants violated other statutes like the Anti-Kickback Statute and the Civil Monetary Penalties Law, which was sufficient to make Osheroff not an original source for his implied certification theory fraud claim allegations).

★ ★ ★

The blog articles publicly disclosed in the news media substantially the same allegations as those in Jacobs's lawsuit before he filed it, and he is not an original source of the information. Therefore, the FCA's public disclosure provision bars this lawsuit.

## IV.

We **AFFIRM** the district court.